John DANIEL, Plaintiff–Appellee,

and

National Union Fire Insurance Co. of Pittsburgh, Pa., Intervenor–Appellee,

v.

ERGON, INC., Magnolia Marine Transport Company, Ergon Refining, Inc., and Mississippi Marine Transport Company, Defendants–Appellants.

No. 88–4611.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1990.

Rehearing and Rehearing En Banc Denied Feb. 21, 1990.

---

**73.** *See Credeur v. Luke,* 368 So.2d 1030, 1032 (La.1979).

William Beanland, Wheeless, Beanland, Shappley and Bailess, Vicksburg, Miss., for defendants-appellants.

Paul S. Minor, Judy M. Guice, Minor & Benton, Biloxi, Miss., John L. Walker, Walker & Walker, Jackson, Miss., for plaintiff-appellee.

James M. Anderson, William C. Martin, Markow, Walker, Reeves & Anderson, Jackson, Miss., for intervenor-appellee.

Before KING and DUHÉ, Circuit Judges, and BIGGERS, District Judge.*

KING, Circuit Judge:

Plaintiff-appellee brought this action against four defendants for personal injuries sustained in a barge explosion. The jury found in favor of the plaintiff on all his claims against all defendants. We reverse as to the plaintiff's Jones Act and unseaworthiness claims against Ergon Refining Incorporated but affirm as to the remainder of the judgment.

I.

On March 5, 1986, plaintiff-appellee, John Daniel (Daniel), was severely injured in an explosion while gas freeing a tank barge (the MM–16) owned by Mississippi Marine Transport Company (Mississippi Marine) and operated by Magnolia Marine Transport Company (Magnolia Marine).[1] Plaintiff was employed by Ergon Refining Incorporated (Ergon Refining). Ergon, Incorporated (Ergon, Inc.) is the parent company of Ergon Refining, Magnolia Marine and Mississippi Marine.[2]

On the day of the explosion, the MM–16 was moored outboard of the MM–30, another barge having its cargo discharged. The MM–30, in turn, was moored outboard of the E–78. The E–78, owned by Ergon, Inc. and operated by Ergon Refining, was a floating barge cleaning and stripping platform used to strip cargo from barges and gas free their tanks. It had a raked bow but no propulsion power, crew quarters or navigation lights. Ingress and egress were provided by a steel catwalk and it was moored to steel pilings along shore. The E–78 was not used to transport cargo and was never moved to job sites. Rather, it was stationary and had not moved since its placement in 1979 (other than to rise and fall with the movements of the Mississippi River). Daniel, his supervisor, Jerry Baugher (Baugher), and two other employees worked off the E–78 stripping and cleaning barges.

On February 28, 1986, the MM–16 was brought in for cleaning by Ergon Refining and was to be gas freed before it was taken to Greenville, Mississippi for repairs. The MM–16 contained highly explosive light crude oil. On March 3, 1986, Daniel and his coworkers began the stripping and cleaning operation. By March 5, the crew had stripped the cargo tanks, but product was left on the walls. At first, butterworthing was employed to clear the cargo tank walls.[3] However, Baugher called Gene Neal who, acting on behalf of Magnolia Marine and Mississippi Marine, autho-

---

* District Judge of the Northern District of Mississippi, sitting by designation.

1. By special interrogatory, the jury found that Magnolia Marine was the owner pro hoc vice of the MM–16.

2. Ergon, Inc., Ergon Refining, Magnolia Marine and Mississippi Marine are referred to collectively as the defendants.

3. Butterworthing is a tank cleaning procedure that combines steam and water at temperatures near 180 degrees. Raw steam, in contrast, often reaches temperatures of 350 degrees or more.

rized the use of steam because butterworthing would leave water residue and the vessel owners were "in a hurry." The evidence at trial established that steam is hotter than butterworthing and creates a mist of static electricity charged clouds and volatile hydrocarbon vapors. Thus, it is far less safe than butterworthing—particularly in an atmosphere with an already high explosive level such as that of the MM–16.[4] However, its use was authorized in this instance and was also permitted by the E–78's operations manual.

On the morning of March 5, steaming commenced in the number four starboard cargo tank of the MM–16. The crew broke for lunch around noon. Upon their return, the crew began steaming the number three tank. While Daniel, Baugher and another employee were meeting on the MM–30, the MM–16 exploded. The explosion was so powerful that the MM–16 literally split in half. Two other crew members on board the MM–30 jumped into the water. Daniel was injured but had reached a place of relative safety away from the flames. Then Daniel heard another crew member, Willie England (England), calling for help because he had suffered a broken leg and could not escape. Daniel reentered the area of danger and rescued England—suffering further injuries.[5]

Daniel filed this action against Ergon Refining, Ergon, Inc., Mississippi Marine and Magnolia Marine raising claims under the Jones Act, general maritime law and section 905B of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b). Upon consent of the parties, the case was referred to a United States Magistrate pursuant to 28 U.S.C. § 636(c). Defendants' motion for summary judgment was denied. The court also denied the defendants' motion for directed verdict. At the defendants' request, the issues presented to the jury were bifurcated by first submitting the Jones Act status issues.[6] By special interrogatory, the jury concluded that the E–78 was a vessel and Daniel a seaman under the Jones Act. After closing arguments and instructions on the remaining issues, the jury, by special interrogatories, found all defendants negligent and the E–78 and MM–16 unseaworthy. Defendants' motion for judgment notwithstanding the verdict and for new trial was denied, and they have timely appealed to this court.

## II.

Defendants first contend that the magistrate erred in failing to hold that Daniel did not have Jones Act status with respect to his employer, Ergon Refining, on defendants' motions for summary judgment and directed verdict. Specifically, defendants alternatively maintain that (1) Daniel was covered by the LHWCA as a barge cleaner and, therefore, could not recover under the Jones Act, or (2) the E–78 was not a vessel and Daniel was not assigned to a fleet of vessels and, thus, Jones Act status was absent. We address the second of these contentions, finding it unnecessary to consider the first.[7]

---

4. Light crude has a higher explosive level than other cargos such as heavy crude or asphalt.

5. Defendants do not even contend that Daniel's actions were negligent.

6. Initial closing statements were permitted on these issues.

7. Defendants maintain that Daniel's primary function was as a barge cleaner covered by the LHWCA and that Daniel is, therefore, not entitled to Jones Act benefits. See Pizzitolo v. Electro–Coal Transfer Corp., 812 F.2d 977, 983 (5th Cir.1987), cert. denied, 484 U.S. 1059, 108 S.Ct. 1013, 98 L.Ed.2d 978 (1988) ("Jones Act benefits [are] available only to maritime workers not covered by the LHWCA."). Williams v. Weber Management Services, Inc. suggests that a deter- mination of LHWCA eligibility should generally be done before a determination of vessel status under the Jones Act. 839 F.2d 1039, 1041 (5th Cir.1987) ("Once a district court makes an initial finding that a worker is covered under the LHWCA, summary judgment is proper under Pizzitolo and a further application of the [Offshore Company v.] Robison [, 266 F.2d 769 (5th Cir.1959) ] test is unnecessary."). However, because the nonexistence of a vessel also results in no claim for benefits under the Jones Act, we choose that road rather than the Pizzitolo route and the Pizzitolo issue is rendered moot. Moreover, we need not consider whether the court below erred in failing to instruct the jury on the meaning of "longshoremen" and then not submitting that issue to the jury. Since we determine that the E–78 was not a vessel and Daniel

■ Seaman status is ordinarily a question for the trier of fact and even where facts are largely undisputed, the jury's role should not be lightly short-circuited. *Bernard v. Binnings Constr. Co., Inc.*, 741 F.2d 824, 827 (5th Cir.1984). Thus, the issue of seaman status "should only be removed from the trier of fact (by summary judgment or directed verdict) in rare circumstances ... and even marginal Jones Act claims should be submitted to the jury." *Id.* However, where the "only rational inference to be drawn from the evidence is that the worker is not a seaman," summary judgment is proper. *Beard v. Shell Oil Co.*, 606 F.2d 515, 517 (5th Cir. 1979). Moreover, where there is a "complete absence of probative facts" to support the inference of seaman status, directed verdict is proper. *See Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir.1989).

■ The existence of a vessel is a "fundamental prerequisite to Jones Act jurisdiction" and is at the core of the test for seaman status. *Bernard*, 741 F.2d at 828. The touchtones are the "purpose for which the craft is constructed and the business in which it is engaged." *Blanchard v. Engine & Gas Compressor Serv., Inc.*, 575 F.2d 1140, 1142 (5th Cir.1978) (*citing The Robert W. Parsons*, 191 U.S. 17, 30, 24 S.Ct. 8, 19, 48 L.Ed. 73 (1903)). In numerous cases we have been called upon to determine the existence of a vessel. From these cases we have discerned three factors common to floating platforms that are not considered vessels:

(1) The structures involved were constructed and used primarily as work platforms;

(2) they were moored or otherwise secured at the time of the accident; and

(3) although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.

*Bernard*, 741 F.2d at 831. Recently, we determined that a structure could be considered a non-vessel even though one of the *Bernard* factors was absent. *Ducrepont v. Baton Rouge Marine Enter., Inc.*, 877 F.2d 393, 395 (5th Cir.1989).[8]

■ The structure at issue here was a floating barge cleaning and stripping platform (the E–78) utilized to strip cargo from barges and gas free their cargo tanks.[9] The E–78 was moored to steel pilings along shore. It had no crew quarters, propulsion power or navigation lights but did have a raked bow. Ingress and egress were provided by a steel catwalk. Electrical lines, washwater lines, slop lines, discharge lines and steam and oil transfer lines used in the gas freeing process ran from the E–78 to shore. It would have taken a day or more to disconnect the E–78 from its location. Significantly, the E–78 was never utilized as a moving transportation unit and, in fact, its only movement since 1979 was its adjustment to the up and down movements of the Mississippi River.

We find the E–78 floating barge cleaning and stripping platform essentially identical to the cleaning barge held not to be a vessel in *Ducrepont*. The structure in *Ducrepont* was originally designed as a cargo barge but functioned as a stationary work platform for repairing and cleaning operations. 877 F.2d at 394. The barge had no means of self-propulsion and no navigation lights. It was generally moored to the shore by wires but was occasionally tugged

was not assigned to a fleet of vessels, this issue is also rendered moot.

**8.** The court determined that *"Bernard* did not attempt to set forth minimum criteria necessary to place a floating structure outside the scope of the definition of 'vessel' under the Jones Act" but rather, only "listed criteria common to structures previously found not to be Jones Act vessels." *Ducrepont*, 877 F.2d at 395.

**9.** The Coast Guard had originally classified the E–78 as a vessel and it was classified as a vessel at the time of the explosion although it was in the process of being reclassified as a facility. However, registration as a vessel with the Coast Guard is only one of a multitude of factors to consider in determining vessel status under the Jones Act. *Bernard*, 741 F.2d at 832 n. 25; *Johnson v. Odeco Oil & Gas Co.*, 864 F.2d 40, 43 (5th Cir.1989).

a short distance from shore due to the level of the water. *Id.* at 394–95. The craft was never inspected by the Coast Guard. The *Ducrepont* court affirmed the district court's grant of summary judgment and held that the cargo barge functioned "primarily as a work platform" and any transportation function it performed was "merely incidental" to its primary function as a non-vessel work platform. *Id.* at 395.

The E–78 is essentially indistinguishable from the work platform in *Ducrepont.* The E–78 functioned as a cleaning (and stripping) platform and was moored to the shore by wires. It had no propulsion, crew quarters or navigation lights. It had been subject to Coast Guard inspection (unlike the *Ducrepont* craft) but had never been tugged to different locations (though the *Ducrepont* craft had).

Daniel cites *Brunet v. Boh Brothers Construction Co.*, 715 F.2d 196 (5th Cir. 1983), and contends that the primary function of the E–78 was transportation because cargo from barges was stripped and put on the E–78. The barge in *Brunet* consisted of several interlocking flexi-float platforms carrying a 150 ton crane used to drive pilings into marshland. The barge had been tugged four times in the preceding six months to bring it to various job sites. *Id.* at 197–98. The district court granted summary judgment finding that the barge was not a vessel. We reversed. In reversing, we found that while the barge was more often used to support the crane than to transport it to job sites, the barge's transportation function was not so "incidental as to warrant the district court's conclusion that the barge was not a vessel as a matter of law." *Id.* at 198.

■ Daniel contends that, like the barge in *Brunet*, the E–78 served a significant transportation function because cargo was often stripped from adjoining barges changing loads. Unloading cargo onto a stationary structure is not, however, a transportation function. A transportation function, like that in *Brunet*, refers to actual movement across navigable waters and the attendant exposure to the risks and hazards of the sea. *See Bernard*, 741 F.2d

at 830 (*citing Cope v. Vallette Drydock Co.*, 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887)). The E–78 never moved to job sites and never transported cargo from place to place. Thus, we conclude that the E–78, as a matter of law, was not a vessel for Jones Act purposes.

■ Nor was Daniel "assigned to a fleet of vessels." We assume, without deciding, that the thirty-five tank barges operated by Magnolia Marine constitute a fleet and the evidence supports a finding that when Daniel worked aboard vessels, they were generally operated by Magnolia Marine. *See Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067, 1074 (5th Cir.1986) (en banc) ("By fleet we mean an identifiable group of vessels acting together or under one control."). However, Daniel was not assigned to the Magnolia Marine fleet of vessels since he was a "transitory maritime worker" only doing work on those vessels when required, as opposed to a "member of a crew" assigned to that fleet of vessels. *Id.*

In *Fazio v. Lykes Brothers Steamship Co., Inc.*, 567 F.2d 301, 302–03 (5th Cir. 1978), we held that summary judgment for the defendant was proper when a shore-gang member who often performed "substantial" work aboard vessels did not have a permanent connection with any vessel or "group of vessels" such that he could be said to be assigned to a fleet of vessels. This was so because he lived at home and did not go to sea, sometimes performed no work on any vessel on a given day and only worked on vessels "when required." Similarly, Daniel was assigned to the E–78 and lived and ate at home. He did not "go to sea" with any vessel. Rather, vessels were brought alongside the E–78 and Daniel cleaned and stripped them. There was little regularity or continuity to Daniel's work on board Magnolia Marine vessels. On any given day, Daniel might have worked on several Magnolia Marine barges or none at all. Daniel also serviced barges other than those in the Magnolia Marine fleet. Moreover, Daniel's job duties included cutting grass and loading trucks on shore. In short, Daniel only worked on Magnolia Marine vessels "when required"

and the transitory nature of his work on these vessels precludes, as a matter of law, a conclusion that Daniel was assigned to a fleet of Magnolia Marine vessels.

We hold that, as a matter of law, the E–78 was not a vessel and that Daniel was not assigned to a fleet of vessels. Thus, Daniel did not have Jones Act status, and the magistrate erred in failing to grant summary judgment or directed verdict in favor of Ergon Refining on this issue.[10]

### III.

■ Defendants next contend that the magistrate erroneously submitted Daniel's negligence claims against Magnolia Marine, Mississippi Marine and Ergon, Inc. to the jury because Daniel did not have seaman status under the Jones Act, and general maritime law provides no right to jury trial. Defendants maintain that reversal on Daniel's Jones Act claim necessitates a remand for new trial without a jury on the remaining claims because the jury trial on those traditionally non-jury issues was only brought about by a non-meritorious Jones Act claim.

Defendants' contention has already been rejected by the Supreme Court in *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1962). The plaintiff in *Fitzgerald* brought an action for injuries he suffered on the defendant's ship. He brought his claim pursuant to the Jones Act (which explicitly provides a seaman with the right to a jury trial) and joined claims for unseaworthiness and maintenance and cure (which traditionally do not require trial by jury). *Id.* at 17, 83 S.Ct. at 1648. The trial judge held in abeyance the maintenance and cure action to try without a jury after resolution of the other two issues by the jury. At trial, the jury rejected the plaintiff's Jones Act and unseaworthiness claims. The Second Circuit found that it was proper for the trial court to hold the remaining action in abeyance for non-jury consideration. *Id.*

The Supreme Court reversed. The Court reasoned that while the Seventh Amend-

ment does not require a jury trial in admiralty cases, "no provision of the Constitution [or statutes] forbids them." *Id.* at 20, 83 S.Ct. at 1650. The Court emphasized that dual fact-finders were "cumbersome, confusing, and time consuming" and "completely unnecessary." *Id.* at 21, 83 S.Ct. at 1650. Thus, the Court held that general maritime claims could (and should) be heard before a jury when joined with Jones Act claims. *Id.* Moreover, the Court ordered a jury trial on the maintenance and cure action despite its refusal to review the dismissal of the plaintiff's Jones Act claim. *Id.* at 21–22, 83 S.Ct. at 1650–51. The *Fitzgerald* rule has been repeatedly followed by this circuit. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 616 (5th Cir.1985) ("A seaman may obtain a jury trial [on a non-jury admiralty claim] by joining it with a Jones Act claim and demanding a jury trial."); *Rachal v. Ingram Corp.*, 795 F.2d 1210, 1213 (5th Cir.1986) ("When non-jury admiralty claims are joined in the same action [with a Jones Act claim], they are treated as pendent to the Jones Act claim, and are tried together for convenience.").

Given the Court's holding in *Fitzgerald*, defendants' argument that they have a *right* to a non-jury trial must be rejected. Thus, despite our reversal on Jones Act status, the use of a jury to decide Daniel's remaining claims was not error. *Accord Simko v. C. & C. Marine Maintenance Co.*, 594 F.2d 960, 965–66 (3d Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979) (Third Circuit, citing *Fitzgerald*, refused to "vacate a jury verdict based on admiralty claims when a directed verdict should have been granted by the district court on the Jones Act claim that formed the predicate to a jury trial.").

### IV.

Defendants summarily assert that the district court erred in refusing to grant directed verdict as to the negligence of Magnolia Marine, Mississippi Marine and

---

**10.** Daniel's claim for unseaworthiness against Ergon Refining must also fail because unseaworthiness requires the existence of a vessel. *See Miles v. Melrose,* 882 F.2d 976 (5th Cir.1989).

Ergon, Inc. Directed verdict should only be granted where "there is a complete absence of probative facts to support the non-movant's claim." *Roberts v. Williams–McWilliams*, 648 F.2d 255, 261 (5th Cir.1981). We reject defendants' contention because the standard for granting directed verdict was not met with respect to these three defendants.[11]

Under section 905(b), covered persons injured by the negligence of a vessel may bring an action against the vessel as a third party. 33 U.S.C. § 905(b). In *Scindia Steam Navigation Co. v. De Los Santos*, the Court held that a vessel owner has two duties under the section:

> (1) to exercise reasonable care "to have the ship and its equipment in such condition that an expert and experienced [covered person] will be able by the exercise of reasonable care to carry on its ... operations with reasonable safety," and
> (2) "to warn the [covered person] of hidden danger which would have been known [to the vessel owner] in the exercise of reasonable care."

451 U.S. 156, 167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981). Moreover, the Court held that "the vessel may be liable if it *actively involves* itself in the ... operations and negligently [causes harm]." *Id.* at 167–68, 101 S.Ct. at 1622–23 (emphasis added).[12]

**11.** The jury found in favor of Daniel on his negligence *and* unseaworthiness counts against these defendants, and we find that the jury's decision on the negligence count should not be disturbed. Therefore, we need not consider defendants' claim of error with respect to unseaworthiness because the jury's verdict can stand on negligence alone.

**12.** Defendants cite *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978) and *Bossard v. Exxon Corp.*, 559 F.2d 1040 (5th Cir.1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 532 (1978). In both these cases, barge owners were not held liable for injuries sustained by employees engaged in gas freeing operations. Both cases are unlike the situation here, however, because of the active involvement of Mississippi Marine and Magnolia Marine in cleaning and gas freeing operations of the MM–16.

**13.** It is undisputed that the MM–16 is a vessel.

■ Mississippi Marine was the owner of the MM–16 and Magnolia Marine was the owner pro hoc vice.[13] From the evidence presented at trial, the jury could have reasonably concluded that Gene Neal, acting on behalf of Mississippi Marine and Magnolia Marine, authorized the use of steam rather than butterworthing because the vessel owners were in a hurry to complete the cleaning operation. There was more than ample evidence for the jury to conclude that the use of steam was negligent. Thus, there was proof upon which the jury could have concluded that Mississippi Marine and Magnolia Marine "actually involve[d]" themselves in the cleaning operation on the MM–16, and the magistrate did not err in refusing to grant the defendants' motion for directed verdict as to the negligence of Mississippi Marine and Magnolia Marine.[14]

■ As for Ergon, Inc., the owner of the E–78, a directed verdict was also properly denied.[15] Ergon, Inc. formulated the operations manual for the E–78 which allowed for the use of steam.[16] The manual was followed by the workers involved in the cleaning operations. Thus, the magistrate did not err in denying a directed verdict as to the general maritime negligence of Ergon, Inc.

**14.** Moreover, as to Magnolia Marine, there was evidence that it participated in the formulation of the operations manual used by Ergon Refining and that the manual allowed for the use of steam in gas freeing. *See infra* note 16.

**15.** Defendants cursory assertion of error with respect to Ergon, Inc. alleges only that there was no proof that Ergon, Inc. breached "any duty of care." We do not consider any other issue regarding Ergon, Inc.'s liability.

**16.** The operations manual for the E–78 was formulated by Ergon, Inc. and Magnolia Marine. The fact finder could have found that this manual contained numerous deficiencies. The most important of these was in the "Instructions for safe handling." Step seven of that section states that in barge cleaning operations, "[w]ater or steam is the usual fluid...." Thus, the manual did not prohibit the use of steam in some circumstances and, in fact, permitted its use. The employees engaged in barge cleaning followed the manual and one employee testified that he marked the word "steam" out of his copy of the manual subsequent to the explosion.

## V.

 Finally, the defendants assert that Daniel's counsel made improper statements during the first closing argument on the issue of Jones Act status. Defendants maintain that Daniel's counsel made the following prejudicial comments: First, that Daniel's counsel stated he would "hopefully" be able to address the jury again.[17] Second, that counsel "argued that the jury instructions as to seaman status must be answered affirmatively."[18] Defendants maintain that these statements misled the jury into believing that the only way Daniel could recover was for him to be found to be a seaman. Defendants did not object to these statements until after closing argument—and then only asked that the jury be "cautioned." Even now, the defendants cite no authority for their claim of error.

In determining the effect of statements made during closing argument, we consider the record as a whole and not merely isolated remarks. *Newman v. A.E. Staley Manufacturing Co.*, 648 F.2d 330, 334–35 (5th Cir.1981). Appellate review is limited to plain error where no objection is made at trial, and if a timely objection is made, the focus is on whether a substantial right of the objecting party is impaired. *See Dixon v. International Harvester Co.*, 754 F.2d 573, 585–86 (5th Cir.1985). Although defendants' objection was not made contemporaneously with the statements made by Daniel's counsel, objection was made upon completion of closing argument. We need not decide the proper standard in such a case because even under the more lenient standard, substantial rights of the defendants were not impaired. The statements made by Daniel's counsel could have been subject to different interpretations but were not so misleading as to confuse the jury as to the ramifications of their decision on Jones Act status. Moreover, the court's instructions emphasized that "you will answer those two questions [about Jones Act status] and then you'll come back for further instructions." Thus, we conclude that based on the record as a whole, substantial rights of the defendants were not impaired by the statements of Daniel's counsel.

## VI.

For all the foregoing reasons, the portion of the judgment against Ergon Refining based on unseaworthiness and Jones Act negligence is REVERSED and the remainder of the judgment is AFFIRMED. Each party shall bear its own costs.

AFFIRMED in part, REVERSED in part.

---

**17.** Specifically, counsel stated:
Now, we're not going to talk about damages and negligence at this point. Hopefully, that will come later.

**18.** Counsel for Daniel stated:
Answering [the seaman status questions] yes, you will have other decisions to make and we will appear before you. But these decisions must be answered affirmatively. Now, let me suggest why . . .