Brian **GREMILLION** and Connie Gremillion, Plaintiffs–Appellants,

v.

**GULF COAST CATERING COMPANY,** Doerle's Quarterboats, Inc., and Albany Insurance Company, Defendants–Appellees.

No. 89–3761.

United States Court of Appeals, Fifth Circuit.

June 28, 1990.

Rehearing and Rehearing En Banc Denied July 23, 1990.

Marvin L. Jeffers, Baton Rouge, La., for plaintiffs-appellants.

Jeanmarie Lococo, Jones, Walker, Waechter, Poitevent, New Orleans, La., for Liberty.

Russell D. Pulver, Ellefson, Pulver & Staines, Metairie, La., for Albany Doerle's & Albany.

Before CLARK, Chief Judge, GARWOOD and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Brian Gremillion and his wife seek recovery for damages arising from a back injury that he incurred while transferring a piece of heavy equipment from a crewboat onto a shoreside housing barge. The plaintiffs premise their causes of action upon the Jones Act, 46 U.S.C.App. § 688, and general maritime law. They claim that Gremillion was a seaman and thus entitled to the special remedies incident to such status. However, as a threshold matter we are called upon to determine whether an unconventional floating structure is a vessel. If it is, a different measure of damages may flow to Gremillion and his wife, assuming of course that he satisfies the remaining preconditions of seaman status.[1] Concluding, however, that Gremillion was not assigned to a Jones Act "vessel" and that the plaintiffs have failed to frame an actionable maritime negligence claim against the barge owner, we affirm the summary judgment.

---

**1.** For a scholarly discussion of seaman status, see Engerrand & Bale, *Seaman Status Reconsid-* *ered*, 24 So.Tex.L.J. 431 (1983).

## I.

Gremillion was employed by Gulf Coast Catering Company (Gulf Coast) as a maintenance man on a quarterboat barge that was chartered to an oil company for the purpose of housing some of its offshore workers.[2] His duties involved the care and upkeep of power generators and other equipment on the Q/B MINDY. He alleges injury to his back while assisting co-employees in transferring a 300–pound ice machine from a crewboat onto another quarterboat barge, the Q/B BARBARA, during low tide in Timbalier Bay, Louisiana.

The ice machine and quarterboat barges at issue in this case are all owned by Doerle's Quarterboats, Inc. (Doerle's), which has no employees. Gulf Coast, a sister corporation of the owner, supplies the personnel to perform all operational and maintenance functions for the barges.

The barge to which Gremillion was assigned, the Q/B MINDY, had been towed to its Timbalier Bay location about six months prior to the accident, partially sunk into a shoreside mudbank, and affixed by lines to a dock. The barge has no self-propulsion capability, no radar, and, aside from navigational lights, no navigational apparatus. It is not registered as a vessel with the Coast Guard and is used exclusively as a stationary housing facility in shallow coastal and inland waters. During the course of Gremillion's assignment on the Q/B MINDY, the barge was never refloated for transportation to a new site, although it was moved off station a few months after his injury.

The Gremillions filed this action against the employer, Gulf Coast, seeking the ancient maritime remedy of "maintenance and cure" as well as Jones Act damages. They also prosecuted a general maritime negligence claim against Doerle's, maintaining that the barge owner breached the warranty of seaworthiness with respect to the Q/B BARBARA, the barge on which the injury occurred, because of an allegedly faulty cleat. The plaintiffs also assert that Doerle's owed a duty to supervise the activities of the independent contractor, Gulf Coast.[3]

The district court granted summary judgment in favor of all defendants. It found the Q/B MINDY not to be a vessel within the meaning of the Jones Act. That being so, the plaintiff never attained seaman status, and the Jones Act and maintenance-and-cure claims against Gulf Coast and its excess insurer were pretermitted.

As a consequence of the Q/B MINDY's nonvessel status, and Gremillion's consequent nonseaman status, the unseaworthiness claim under general maritime law against the barge owner was also foreclosed. Further, the court concluded that the residual negligence claim against Doerle's for lack of supervision could not be maintained, since barge owners generally have no obligation to protect the employees of independent contractors, such as Gulf Coast, and none of the exceptions to this rule was implicated by the facts of this case.

On appeal, the Gremillions argue that the district court's legal conclusion regarding the Q/B MINDY's nonvessel status under the Jones Act is at odds with this circuit's maritime jurisprudence. They emphasize that the barge was capable of being moved easily, was involved in commerce, and possessed other attributes of Jones Act vessels, such as navigational lights, life preservers, and sleeping quarters. They suggest that any dissimilarity between the quarterboat here and a conventional vessel

**2.** The quarterboat barge at issue in this case has *two decks and serves as a floating hotel for* 40–60 personnel. It is designed to service oil companies working in inland waterways and shallow offshore areas. Among other things, the barge provides messing, sleeping, and recreational facilities. Lacking self-propulsion, however, the craft is usually towed to a desired location and "spudded down" on one side to the seafloor, with the other side fixed, directly or indirectly, to a bank (There were only two

spuds, both on one side.). Despite advertisements that emphasized the barge's blue-water capability, there is no evidence to suggest that the Q/B MINDY ever operated in the open sea to provide housing for offshore workers.

**3.** Albany Insurance Company was joined as a defendant because it serves as the excess-liability insurer for both Gulf Coast and Doerle's.

can be explained by the barge's "special use" nature, reminiscent of the mobile drilling platforms and barges in *Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d 817 (5th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976), and *Producers Drilling Co. v. Gray*, 361 F.2d 432 (5th Cir.1966). Such platforms and barges, we are reminded, qualified for vessel status.

In response, the defendants argue that the Q/B MINDY is not a vessel, since it lacks most of the attributes associated with conventional vessels (e.g., engines, bilge pumps, navigational equipment, and Coast Guard registration). They emphasize that Gremillion was not injured while the Q/B MINDY was being moved and, further, that the quarterboat does not qualify as a "special use" vessel since it cannot be compared fairly to the deep-sea mobile work platforms that attained vessel status in *Hicks* and *Gray*. They assert that the Q/B MINDY is not designed for purposes of navigation and commerce; rather, its primary function is to provide housing in the inland waterways, and its transportability is purely incidental, not necessary, to its commercial mission. The fact that the Q/B MINDY may be floated and towed about the waterways should not change its non-vessel status, we are told, because the barge was never moved off location during Gremillion's tenure.

## II.

### A.

In reviewing a summary judgment on appeal, circuit courts apply the same standard of review as the district courts. *Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 548 (5th Cir.1989); *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.*, 832 F.2d 1358, 1364 (5th Cir.), *clarified*, 832 F.2d 1378 (5th Cir.1987). That is, summary judgment should be affirmed if the nonmovant fails

to establish the existence of an essential element in his cause of action for which he bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Under this standard of review, all evidence must be reviewed in a light most favorable to the plaintiffs, the parties opposing summary judgment here. *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 192 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986).

■ The question of whether a claimant is a seaman is generally a factual determination. *See Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1074 (5th Cir.1986) (en banc). However, seaman status may be decided on summary judgment where the evidence does not support a finding, as a matter of law, that the claimant is permanently assigned to a Jones Act vessel. *Ketnor v. Automatic Power, Inc.*, 850 F.2d 236, 238 (5th Cir.1988); *Hemba v. Freeport McMoran Energy Partners, Ltd.*, 811 F.2d 276, 277 (5th Cir.1987); *Waguespack v. Aetna Life & Cas. Co.*, 795 F.2d 523, 526 (5th Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 163 (1987).

### B.

■ "The existence of a vessel is a 'fundamental prerequisite to Jones Act jurisdiction' and is at the core of the test for seaman status." *Daniel v. Ergon, Inc.*, 892 F.2d 403, 407 (5th Cir.1990) (quoting *Bernard v. Binnings Constr. Co.*, 741 F.2d 824, 828 (5th Cir.1984)). Unfortunately, the term "vessel" has escaped precise definition, *Bernard*, 741 F.2d at 829, which helps to explain why special-use structures such as submersible oil and gas drilling platforms may qualify at times as Jones Act vessels,[4] despite traditional notions in maritime jurisprudence to the contrary.[5]

---

**4.** *See, e.g., Hicks*, 512 F.2d at 824 (submersible oil storage facility is a Jones Act vessel); *Gray*, 361 F.2d at 437 (submersible drilling barge is a vessel); *Offshore Co. v. Robison*, 266 F.2d 769,

776 (5th Cir.1959) (mobile oil drilling platform with retractable legs can qualify as vessel).

**5.** *See, e.g., Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 22,

The arguable vagueness of the term "vessel" also has led to serious, though unsuccessful, attempts to secure vessel status for floating planes and helicopters.[6] Not surprisingly, it has been suggested that "three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale." *Burks v. American River Transp. Co.*, 679 F.2d 69, 75 (5th Cir.1982).

As a general principle, where the vessel status of an unconventional craft is unsettled, it is necessary to focus upon the "purpose for which the craft is constructed and the business in which it is engaged." *Blanchard v. Engine & Gas Compressor Servs., Inc.*, 575 F.2d 1140, 1142 (5th Cir. 1978) (citing *The Robert W. Parsons*, 191 U.S. 17, 30, 24 S.Ct. 8, 12, 48 L.Ed. 73 (1903)). The caselaw is heavily skewed in favor of conferring such status upon craft whose primary mission is the transportation of cargo, equipment, or passengers over navigable waters. The greater the structure's resemblance to conventional seafaring craft, the greater the odds of securing vessel status.

In light of this bias favoring traditional craft, it is not surprising that we look to whether a given structure maintains or possesses (1) navigational aids, (2) lifeboats and other life-saving equipment, (3) a raked bow, (4) bilge pumps, (5) crew quarters, and (6) registration with the Coast Guard as a vessel. *See Bernard*, 741 F.2d at 832 n. 25. In addition, the intention of the owner to move the structure on a regular basis, the ability of the submerged structure to be refloated, and the length of time that the structure has remained stationary are also relevant to the inquiry. *See Hemba*, 811 F.2d at 278.

Structures need not lack all of the above-mentioned attributes to be deemed nonvessels. *See Ducrepont v. Baton Rouge Marine Enters., Inc.*, 877 F.2d 393, 395 (5th Cir.1989). The greater the degree of attenuation from the attributes of traditional vessels, as outlined by *Bernard* and *Hemba*, the less likely that Jones Act jurisdiction and seaman status will be secured by the claimant.

Nevertheless, exotic craft may qualify as vessels, especially if frequently navigated, or if exposed to the perils associated with maritime service, or if injury occurs during ocean transport. In fact, we have stated that "a structure whose purpose or primary business is *not* navigation or commerce across navigable waters may nonetheless satisfy the Jones Act's vessel requirement if, at the time of the worker's injury, the structure was actually engaged in navigation." *Bernard*, 741 F.2d at 829 (emphasis in original).[7]

Our decisions in this area instruct, however, that as a matter of law certain dry docks and floating work platforms will not qualify as Jones Act vessels.[8] A survey of this caselaw demonstrates three common attributes for nonvessels:

(1) The structure is constructed to be used primarily as a work platform;

(2) the structure is moored or otherwise secured at the time of the accident; and

(3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transporta-

---

46 S.Ct. 379, 380, 70 L.Ed. 805 (1926) (wharfboat used to stow cargo, and having no means of propulsion, is not a vessel).

**6.** *See, e.g., Barger v. Petroleum Helicopters, Inc.*, 692 F.2d 337, 344–45 (5th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1316 (1983); *Smith v. Pan Air Corp.*, 684 F.2d 1102 (5th Cir.1982).

**7.** Gremillion was not injured during navigation of the Q/B MINDY, and thus this exception does not apply.

**8.** *See, e.g., Daniel* (floating platform used for cleaning and stripping not a Jones Act vessel); *Ducrepont* (repair barge not a vessel); *Johnson v. ODECO Oil & Gas Co.*, 864 F.2d 40 (5th Cir.1989) (oil production platform that had not been moved in about 24 years not a vessel); *Hemba* (gulf rig moved only twice in 20 years not a vessel); *Bernard* (small raft-like work platform used to drill pilings not a vessel); *Waguespack* (floating work platform, used to aid in unloading grain barges, not a vessel).

tion function is merely incidental to the platform's primary purpose.

*Daniel*, 892 F.2d at 407 (citing *Bernard*, 741 F.2d at 831).

We conclude that the quarterboat barge in this case shares sufficient traits with the family of fixed platforms and floating work barges previously denied vessel status to qualify as a nonvessel for purposes of the Jones Act. We recognize that the Q/B MINDY was easily transportable; nevertheless, the significance of its transportation function is purely incidental to its primary mission of providing living facilities to workers in relatively shallow waterways. It does not transport cargo or passengers, it is not designed for navigation, it was not engaged in navigation at the time of the injury, and there is no evidence to suggest that the Q/B MINDY ever provided housing on the open sea unattached, directly or indirectly, to an appurtenance of the shore.

Significantly, the Q/B MINDY's motive power was provided externally through towboats, as it had no engines, rudders, or navigational equipment (except lights). It also was not registered with the Coast Guard as a vessel. In weighing all the factors that this court deems relevant to vessel status, the conclusion is inescapable that the Q/B MINDY is a nonvessel for purposes of the Jones Act.[9]

The plaintiffs' reliance upon *Hicks, Robison,* and *Gray* for purposes of securing vessel status for this shoreside housing barge is misplaced. Those cases did not concern shoreside quarterboat barges but deep-water oil and gas platforms, which embody materially different attributes from the Q/B MINDY, and which are exposed to the hazards of the open sea. The quarterboat barge was also not directly engaged in any drilling or exploration activities. Further, we have recently stated that *"Hicks* is no longer the controlling standard" in vessel status, since its broad language has been narrowed considerably through cases such as *Bernard* and *Hemba. Johnson*, 864 F.2d at 43.[10]

Accordingly, the district court properly held that as a matter of law the shoreside quarterboat barge in this case did not qualify as a Jones Act vessel, as the craft fairly falls within the family of nonvessels styled "floating work platforms." Recovery of damages thus is not available to Gremillion as a seaman. Finding that the remaining negligence claims raised herein on appeal lack merit,[11] we AFFIRM.

**9.** We are aware that the Q/B MINDY arguably satisfies seven of the nine factors for vessel status set forth in our recent opinion in *Johnson v. ODECO Oil & Gas Co.*, 864 F.2d at 43. That is, the Q/B MINDY has navigational lights; a raked bow; life-saving equipment; crew quarters; the owner's intention to move it on a recurring basis; ability (presumably) to be refloated after years of deterioration; and a relatively short time remaining stationary. It lacks the other two attributes, bilge pumps and Coast Guard registration. We note, however, that those factors are not to be applied mathematically but are useful guides in determining vessel status. Despite its navigation-oriented qualities, the Q/B MINDY's transportation function remains subordinate to its contrasting function of providing housing in shallow waters.

**10.** *See also Beer, Keeping Up with the Jones Act,* 61 Tul.L.Rev. 379, 398–99 (1986) (criticizing this court's pronouncements on vessel status as extending to small man-made islands and other inapposite objects).

**11.** Since Gremillion failed to establish seaman status and, further, was not even assigned to the Q/B BARBARA, his unseaworthiness claim against the barge owner is untenable. *See Dove v. Belcher Oil Co.*, 686 F.2d 329, 332–33 (5th Cir.1982) (seaman status anchored to assigned vessel). In addition, no authority is cited to us to support plaintiffs' claim that Doerle's had a duty to supervise the operations of the independent contractor, Gulf Coast, in transferring the heavy equipment. *See, e.g., Morris v. Compagnie Maritime des Charqeurs Reunis, S.A.*, 832 F.2d 67, 71 (5th Cir.1987) (shipowner has no duty to anticipate injuries of stevedores who ignore obvious defects on ship; injured worker must look to employer for compensation), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988)).