United States Court of Appeals,

Fifth Circuit.

No. 91-3110.

Leroy MICHEL, Jr. and Cindy Michel, Plaintiffs-Appellees, Cross-Appellants,

v.

TOTAL TRANSPORTATION, INC. and Assuranceforeningen Gard, Defendants-Appellants, Cross-Appellees.

April 2, 1992.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before THORNBERRY, KING and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Leroy Michel ("Michel") filed this action against his employer, Total Transportation, Inc. and its insurer, Assuranceforeningen Gard (collectively, "TTI"), to recover damages under the Jones Act (46 U.S.C.App. § 688) and general maritime law for unseaworthiness and in the alternative, under 33 U.S.C. § 905(b), the Longshore and Harbor Workers' Compensation Act (LHWCA) for personal injuries he suffered in the course of his employment. Michel's wife, Cindy Michel, asserted a claim for loss of consortium under general maritime law. After a bench trial, the district court found that the GEMINI was a special purpose vessel, Michel was a "seaman" entitled to the remedies of the Jones Act, TTI was negligent under the Jones Act and the LHWCA, and the GEMINI was unseaworthy. The district court awarded Michel $534,000 in damages,[1] and $35,000 to Cindy Michel for loss of consortium. TTI

---

[1]These damages consist of the following components:
    1. $100,000 for pain, suffering and disability from

appeals asserting that the Jones Act does not apply. Michel cross-appeals the $250,000 award for loss of future earnings and earning capacity. We reverse the award of damages for loss of consortium and otherwise affirm the judgment.

Michel was permanently assigned to the GEMINI, a special purpose barge, owned by TTI. The GEMINI was designed to transfer bulk cargo, usually grain, midstream from river barges to ocean-going vessels. The GEMINI performs this unique transfer function on a six mile stretch of the Mississippi River. The GEMINI is moved into position midstream by a tug or push-boat. When working, the GEMINI is held in position by side deck winches, whose cables are lashed onto the ocean-going vessel. The ocean-going vessel is moored to a mooring buoy and anchored in the river. The cargo barges are secured alongside the GEMINI. The GEMINI's two large cranes scoop the grain out of the barge holds and place it in the hopper on the GEMINI where the grain is weighed, tested, then deposited into the hold of the ocean-going vessel. The GEMINI can be equipped with navigation aids when necessary. Michel's regular duties on the GEMINI involved driving a tractor inside the cargo holds of river barges to sweep them clean of all the grain. His duties also included handling cables

date of accident;

2. $150,000 for future pain, suffering and disability;

3. $34,000 for past wage loss, including fringe benefits; and

4. $250,000 for loss of future earnings and earning capacity.

and lines, operating deck machinery, as well as cleaning and painting the GEMINI.

On October 7, 1989, Michel was pressure-washing the grain dust off of the hopper on the GEMINI. He was suspended in a basket from one of the large cranes normally used to transfer cargo from the barges. The basket was attached to the crane by a holding line. Because the crane was not designed for carrying personnel, a "headache ball" was attached to the holding line approximately three feet above Michel's head in order to provide additional weight so that the crane would operate more easily. The combined weight of the basket, Michel, and the headache ball totalled less than 1,000 pounds. As the crane's load descended, the basket settled upon a suspended dust pipe, but the headache ball continued to lower, striking Michel's hand and pinning it to the side of the basket. The basket then tipped, and Michel was thrown clear landing on the roof of a small work shed. As a result, Michel suffered multiple fractures to his right hand, and left elbow.

I. WAS MICHEL A JONES ACT SEAMAN?

In relevant part, the Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply...."

46 U.S.C.App. § 688(a).[2]  To qualify as a seaman under the Jones Act, the plaintiff must show that he was permanently assigned to or performed a substantial part of his work aboard a "vessel". *Gremillion v. Gulf Coast Catering Company,* 904 F.2d 290 (5th Cir.1990).  "The existence of a vessel is a "fundamental prerequisite to Jones Act jurisdiction' and is at the core of the test for seaman status.  Unfortunately, the term "vessel' has escaped precise definition, which helps to explain why special-use structures ... may qualify at times as Jones Act vessels, despite traditional notions in maritime jurisprudence to the contrary." *Id.* at 292 (citations omitted).

The Supreme Court has recently stated that the determination of who is a seaman is "better characterized as a mixed question of law and fact, rather than a pure question of fact."  *McDermott Int'l, Inc. v. Wilander,* --- U.S. ----, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991), *quoted in Southwest Marine Inc. v. Gizoni,* --- U.S. ----, ----, 112 S.Ct. 486, 492, 116 L.Ed.2d 405.  Nonetheless, "[t]he inquiry into seaman status is of necessity fact-specific; it will depend on the nature of the vessel, and the employee's precise relation to it."  *Id.*  We review findings of mixed law and

---

[2]The "statute ... modifying ... the common law right ... in cases of personal injury to railway employees" was the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., which provides that:

> "Every common carrier ..., shall be liable in damages to any person suffering injury while he is employed by such carrier ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier,...."  45 U.S.C. § 51.

fact in the following manner:

> As to the trial court's underlying factual findings and factual inferences deduced there from, we are bound by the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure. However, as to the legal conclusion reached by the district court based upon this factual data, ... we may review this as an issue of law.

*Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 666 (5th Cir.1983).

## A. THE GEMINI

The GEMINI is a "special purpose structure" not readily identifiable as a ship. The seminal Fifth Circuit case on this subject, *Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir.1959), involved a floating drilling platform. The court referred to this structure as a "special purpose structure," since it was not usually employed as a means of transport by water but was nonetheless designed to float on water. *Id.* at 779. Later cases narrowed this definition so that it is no longer enough just to show that the structure is designed to float on water:

> In order to qualify as a Jones Act seaman [the plaintiff] must have worked on a "vessel." The Jones Act does not define the term "vessel," and we have repeatedly held that the term is incapable of precise definition. However, *we may rely on the purpose for which the craft was built and the business in which it was engaged* to guide our inquiry. Other factors, like the structure's size, its ability to float, its permanent fixation to the shore or the bottom, and its movement or its ability to move across navigable waters are inconclusive. Further, structures whose primary function is non-navigational or non-transportational may still qualify as vessels if the structure was involved in navigation at the time of the injury.

*Ellender v. Kiva Construction & Engineering, Inc.,* 909 F.2d 803, 806 (5th Cir.1990) (citations omitted and emphasis added).

In *Bernard v. Binnings Const. Co. Inc.,* 741 F.2d 824 (5th Cir.1984), we noted that we are seldom presented with direct evidence of the purpose which a vessel's designer may have had in mind. Therefore, we developed a list of objective features, which suggest that a structure's intended purpose is transportation across navigable waters. "These features are: (1) navigational aids; (2) raked bow; (3) lifeboats and other lifesaving equipment; (4) bilge pumps; (5) crew quarters; and (6) registration as a vessel with the Coast Guard." *Id.* at 832 n. 25. The district court found that the GEMINI had all of these features describing the GEMINI as having a raked bow, a Coast Guard registry, a first-preferred ship mortgage, crew feeding quarters, a locker room with showering and toilet facilities, an elaborate ballast system, bilge pumps, and other complex machinery and equipment built into her hull. *Michel v. Total Transportation, Inc.,* No. 91–3110 (E.D.La. January 4, 1991) at 232, 239–41 (hereinafter, *Michel* ).

TTI argues that since the purpose of the GEMINI is the transfer of cargo (primarily grain) from river barges to oceangoing vessels, it is essentially a floating grain elevator and, therefore, performs stevedoring services, i.e. the transfer and stowage of cargo. According to TTI, the GEMINI's transportation function is incidental to its primary stevedoring purpose, therefore, its capability of and occasional movement across navigable waters is not determinative of vessel status. TTI compares the GEMINI to the numerous special purpose structures for

which the Fifth Circuit has denied vessel status:

> (1) The structures involved were constructed and used primarily as work platforms;
>
> (2) They were moored or otherwise secured at the time of the accident; and
>
> (3) Although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.

*Id.* at 806.

We agree with the district court that the GEMINI's transportational function is not "merely incidental": to its primary purpose as a work platform. The district court correctly concluded that the GEMINI is

> designed to move cargo from vessel to another ... she does move cargo, albeit not for great distances. If one wants to look at it as a continuous transportation by water of grain ... from some inland port upriver to some foreign port, she's an integral part of that journey,.... If one views this as a continuous voyage, she's a necessary link in a continuous voyage, the cargo of which never hits shore. In that sense, one could certainly call her a vessel, ... *Michel* at 241–242.

The district court concluded that aboard the GEMINI, Michel was "exposed to the typical perils of the sea as any other river seaman." *Michel* at 239. We agree with these conclusions and hold that the GEMINI is a "vessel" under the Jones Act.


B. MICHEL


To determine whether Michel is a "seaman" under the Jones Act, we specifically look at his connection to the vessel, GEMINI.

"[*McDermott Int'l, Inc. v.*] *Wilander* jettisoned any lingering notion that a maritime worker need aid in the navigation of a vessel in order to qualify as a "seaman" under the Jones Act. "The key to seaman status is employment-related connection to a vessel in navigation.... It is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work.' " *Southwest Marine,* 112 S.Ct. at 492 (quoting *McDermott,* 111 S.Ct. at 817).

In addition, Michel must show that he "was assigned permanently to a vessel ... or performed a substantial part of his work on the vessel; ..." *Robison,* 266 F.2d at 779.

We hold that Michel was permanently assigned to the GEMINI and was doing the vessel's work. His job related to the basic functions of the GEMINI and encompassed the range of incidental duties typical of a seaman, handling cable lines and assisting in the general cleaning and maintenance of the GEMINI. The district court found that on the day of the accident, "the work that [Michel was] doing is exactly what seaman do. They chip paint, they clean the vessel,.... [t]hey do general maintenance work on that vessel." *Michel* at 243. In light of *McDermott* and *Southwest Marine,* the district court's conclusion that Michel is a seaman is correct.

## II. LOSS OF CONSORTIUM

Whether or not damages are available for loss of consortium is a legal question, reviewable *de novo.* *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

TTI argues that the district court's award of damages to Michel's wife for loss of consortium was invalid under the Supreme Court's decision in *Miles v. Apex Marine Corp.,* --- U.S. ----, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). In *Miles,* the Court held that "there is not recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman." *Id.* 111 S.Ct. at 326. TTI contends that the difference between a wrongful death action and a personal injury claim is insignificant, and that the rationale of *Miles* applies equally to this case. TTI also argues that the *Miles* court limited the kinds of damages available in general maritime law death actions to those damages Congress deemed appropriate under the Jones Act, therefore, the same limits should apply to general maritime law personal injury actions.

Michel argues that we are still bound by the holding in *Cruz v. Hendy Int'l Co.,* 638 F.2d 719 (5th Cir.1981) that the spouse of a seaman whose injuries are attributable to the unseaworthiness of a vessel has a general maritime cause of action for loss of his society. *Id.* at 721. Michel asserts that the *Miles* holding did not affect the validity of *Cruz* because *Miles* involved a wrongful death claim and *Cruz* involved a personal injury claim. Michel also argues that a claim for loss of consortium in a personal injury action was allowed at common law when the Jones Act became law; and therefore, Congress intended to incorporate this type of recovery into the Jones Act. "We assume that Congress is aware of existing law when it passes legislation." *Miles,* 111 S.Ct. at 325 (citing *Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99

S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979)).

In *Miles,* the Supreme Court stressed the importance of uniformity concerning the claims available under the Jones Act and general maritime law. "It would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially-created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence." *Id.,* 111 S.Ct. at 326. We choose to follow the lead of *Miles* and hold that damages recoverable in general maritime causes of action for personal injury of a Jones Act seaman do not include loss of consortium. To the extent that *Cruz* differs with this holding, we think that it does not survive *Miles.* We join several Louisiana district courts who have considered the issue and have held that *Miles* applies to claims for loss of society or consortium in personal injury cases brought under general maritime law. *See, e.g., Dunbar v. American Commercial Barge Lines Co.,* 771 F.Supp. 151, 152 (M.D.La.1991); *West v. Zapata Gulf Marine Corp.,* 766 F.Supp. 502, 503 (E.D.La.1991); *Cater v. Placid Oil Co.,* 760 F.Supp. 568, 570 (E.D.La.1991); *Breland v. Western Oceanic, Inc.,* 755 F.Supp. 718, 719 (W.D.La.1991); and *Anglada v. Tidewater, Inc.,* 752 F.Supp. 722, 725 (E.D.La.1990).

### III. LOSS OF FUTURE EARNINGS AND EARNING CAPACITY

We review the district court's finding of damages under the

clearly erroneous standard.  *Wakefield v. United States,* 765 F.2d 55, 57 (5th Cir.1985).  We will judge a district court's finding to be clearly erroneous when, after reviewing the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed."  *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

In his cross-appeal, Michel argues that the district court's award of $250,000 for loss of future earnings and earning capacity was clearly erroneous because the award was based on an overly optimistic view of Michel's ability to overcome his physical restrictions and earn income comparable to the wages he received from TTI, $11.50 an hour and $17.25 an hour for overtime.  Michel's vocational expert claims that Michel will be able to return to employment paying slightly above minimum wage.  TTI's vocational expert claimed that Michel will be able to return to work earning substantially above the minimum wage.  Economic reports presented by both sides calculated a wide range of damage figures for lost future income, from $823,133 down to $150,395.

The district judge correctly concluded that as fact finder, he was free to accept or reject the experts' reports and could reach his own conclusion regarding lost earning capacity.  *See, Leefe v. Air Logistics, Inc.,* 876 F.2d 409, 411 (5th Cir.1989) (jury's damage award for future lost wages need not fall within estimates given by expert testimony);  *Haas v. Atlantic Richfield,* 799 F.2d 1011, 1017 (5th Cir.1986) (economic experts' calculations of future

lost earnings is only a suggested guideline for the trier of fact).

After our review of the record in this case, we conclude that the district judge's award for lost future earnings and earning capacity was not so overly optimistic concerning Michel's ability to return to gainful employment as to be clearly erroneous.

IV. CONCLUSION

The award of damages for loss of consortium is REVERSED, otherwise the judgment of the district court is AFFIRMED.