United States Court of Appeals,

Fifth Circuit.

Nos. 94-30156, 94-30446.

David BURCHETT and Cheryl Burchett, Plaintiffs-Appellants,

v.

CARGILL, INC., Defendant-Intervenor-Appellee, Appellant,

v.

MARINE EQUIPMENT MANAGEMENT CORPORATION, Defendant-Appellee.

March 29, 1995.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before GARWOOD, DAVIS and REYNALDO G. GARZA, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs David and Cheryl Burchett appeal the dismissal of their Jones Act and unseaworthiness actions against Cargill, Inc. ("Cargill") and their § 905(b) action against Marine Equipment Management Corporation ("MEMCO"). We affirm.

I.

David Burchett, a crane operator employed by Cargill, was injured when he slipped and fell on the cover deck of the K-2, a midstream bulk cargo transfer unit owned and operated by Cargill. The K-2, located in the Mississippi River near Convent, Louisiana, is used to transfer bulk products, usually grain, from river barges to ocean-going vessels. The K-2's structure was built on top of a 330 x 75 foot barge in 1981. The K-2 is permanently moored to the bottom of the Mississippi River, approximately 500 feet from the river's east bank. It has been in this position since 1982.

The K-2 has no engines, thrusters, or any other independent mode of locomotion other than a winch and cable system used to reposition the K-2 alongside the ocean-going vessel. The K-2's backward and forward mobility is limited to the length of the cables (1,200 feet), and it has no capacity to move laterally. The K-2 has a raked bow, a ballast system, anchor lights, life boats and jackets, and a radar unit used to monitor weather conditions. Although it has an eating area and locker rooms for the crew, the crew does not sleep aboard the K-2 but rather is transported to and from shore daily. The K-2 is not registered as a vessel with, nor has it ever been inspected by, the U.S. Coast Guard.

During the cargo transfer process, the ocean-going vessel maneuvers itself to the west side of the K-2. Tugs then push the grain barges into position on the east side of the K-2. Cargill personnel then transfer the grain from the cargo holds of the barges to the cargo holds of the ocean-going vessel. Throughout this process, the K-2 remains stationary except for some minor adjusting to align the K-2's offloading spouts over the cargo holds of the vessel.

To offload the cargo from the barge, Cargill personnel first remove the hatch covers from the cargo barge with a crane and stack them on the K-2's cover deck. When the offloading process is complete, a second crane on the K-2 cover deck replaces the covers on the barge. According to Mr. Burchett, on October 1, 1992, Cargill personnel removed the hatch covers from a cargo barge owned by MEMCO and stacked them on the cover deck of the K-2. Burchett

2

testified that he slipped when he stepped on one of the hatch covers. He contends the covers were slippery because dew and soybean dust had accumulated on them during the offloading process. He also complains that the covers were not painted with non-skid paint.

David and his wife Cheryl originally filed this action in state court, asserting Jones Act and unseaworthiness claims against both Cargill and MEMCO. Cargill and MEMCO removed the case to federal court on the basis of diversity, asserting that plaintiffs' Jones Act claims were baseless. The plaintiffs moved to remand the action to state court on the ground that Jones Act cases are non-removable. The district court denied the motion to remand and subsequently entered summary judgment in favor of Cargill on the grounds that the K-2 was not a vessel and, therefore, Burchett was not a seaman under the Jones Act. Cargill later filed an intervention seeking reimbursement from MEMCO for the compensation benefits paid to Burchett under the Longshoremen and Harbor Workers' Compensation Act ("LHWCA").

After plaintiffs' motion to remand was unsuccessful, they amended their complaint against MEMCO, withdrawing the Jones Act claim and adding a negligence claim under § 905(b) of the LHWCA and the general maritime law. The district court subsequently granted summary judgment in favor of MEMCO as well, on the grounds that the summary judgment evidence revealed that MEMCO had no liability under § 905(b). Plaintiffs now appeal.

## II.

3

A.

Plaintiffs argue first that the district court erred in refusing to remand their action to state court because Jones Act suits are not removable. As a general rule, we agree that Jones Act cases are not removable. *Johnson v. ODECO Oil & Gas Co.,* 864 F.2d 40, 42 (5th Cir.1989); 46 App.U.S.C. § 688 (incorporating general provisions of Federal Employers' Liability Act, including 28 U.S.C. § 1445(a), which bars removal). However, this court has recognized that in certain circumstances "defendants may pierce the pleadings to show that the Jones Act claim has been fraudulently pleaded to prevent removal." *Lackey v. Atlantic Richfield Co.,* 990 F.2d 202, 207 (5th Cir.1993). In *Lackey,* we held that, like fraudulent joinder cases, defendants sued under the Jones Act can defeat remand upon showing that plaintiffs' claims against non-diverse defendants "are baseless in law and in fact and "serve[ ] only to frustrate federal jurisdiction.' " *Id.* (quoting *Dodd v. Fawcett Publications, Inc.,* 329 F.2d 82, 85 (10th Cir.1964)).

The burden of persuasion on a removing party in such a case, however, is a heavy one: "The removing party must show that there is no possibility that plaintiff would be able to establish a cause of action."[1] *Id.* While we have cautioned against pretrying a case to determine removal jurisdiction, we have recognized the district court's authority to use a summary judgment-like procedure for

---

[1] An additional ground for fraudulent pleadings—that there has been an outright fraud in the plaintiff's pleadings of jurisdictional facts—is not at issue in this case. *See Dodson v. Spiliada Maritime Corp.,* 951 F.2d 40, 42 (5th Cir.1992).

4

disposing of fraudulent pleading claims. *See B., Inc. v. Miller Brewing Co.,* 663 F.2d 545, 549 n. 9 (5th Cir.1981). Accordingly, in determining whether a plaintiff's claims are baseless, the district court must resolve all disputed questions of fact and any ambiguities in the current controlling substantive law in favor of the plaintiff. *See Carriere v. Sears Roebuck & Co.,* 893 F.2d 98, 100 (5th Cir.), *cert. denied,* 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990); *Bobby Jones Garden Apartments, Inc. v. Suleski,* 391 F.2d 172, 177 (5th Cir.1968). A denial of remand is permissible where the district court "determine[s] that *as a matter of law* there was no reasonable basis for predicting that the plaintiff might establish liability." *Miller Brewing,* 663 F.2d at 551 (fraudulent joinder case) (citations omitted).

## B.

Defendants contended below that plaintiffs had no possibility of sustaining a Jones Act claim because the K-2 is not a vessel. In support of this assertion, defendants submitted an affidavit outlining in some detail the relevant facts about the nature and use of the K-2. None of the facts that are pertinent to our inquiry were disputed by plaintiffs. The district court concluded that the K-2 is not a vessel as a matter of law and thus that "plaintiffs' allegations of seaman's status are baseless."

The existence of a vessel is a fundamental prerequisite to a Jones Act claim and is central to the test of seaman status. *Daniel v. Ergon, Inc.,* 892 F.2d 403 (5th Cir.1990); *Blanchard v. Engine & Gas Compressor Servs., Inc.,* 575 F.2d 1140, 1141 (5th

5

Cir.1978). Plaintiffs, therefore, cannot possibly recover on their Jones Act claim unless the K-2 is a vessel. *Johnson,* 864 F.2d at 42-43.

In determining whether a structure is a vessel, the touchstones are "the purpose for which the craft is constructed and the business in which it is engaged." *Blanchard,* 575 F.2d at 1142. We have been called upon on a number of occasions to determine whether a structure, used as a floating platform in ship repair or longshoring operations, was a vessel. Several of these cases have identified three factors usually present when floating platforms are not vessels:

> (1) the structures involved were constructed and used primarily as a work platforms; (2) they were moored or otherwise secured at the time of the accident; and (3) although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose.

*Bernard v. Binnings Constr. Co., Inc.,* 741 F.2d 824, 831 (5th Cir.1984); *see also Ellender v. Kiva Constr. & Eng'g, Inc.,* 909 F.2d 803, 806, (5th Cir.1990); *Daniel,* 892 F.2d at 407; *Ducrepont v. Baton Rouge Marine Enters., Inc.,* 877 F.2d 393, 395 (5th Cir.1989).

The K-2 satisfies all three of these factors. It was constructed to serve as a base or platform to transfer bulk cargo from barge to ship. It was not only securely moored at the time of the accident but had been securely moored at the location for a decade. The limited movement of the K-2, along its mooring lines, to align the K-2's offloading spouts over the cargo holds of the

6

vessel is certainly incidental to its primary purpose of shifting the cargo from one vessel to another.

We read the cases as establishing the above factors as the most important considerations in resolving whether a work platform is a vessel. *See Daniel,* 892 F.2d at 407-08. Some of the cases suggest an expanded list that also may be considered.[2] While this list may be helpful in resolving close cases, we do not find these factors useful in deciding a case such as this where all three *Daniel* factors are satisfied and the structure has been continuously moored and used as a floating platform for a number of years.

Plaintiffs' principal argument on appeal is that this court's decision in *Michel v. Total Transp., Inc.,* 957 F.2d 186 (5th Cir.1992) compels reversal of the district court. In *Michel,* we held that a similar midstream bulk transfer rig was a vessel. However, the structure at issue in *Michel,* the GEMINI, is readily distinguishable from the K-2. Instead of remaining stationary, the GEMINI was towed to a mid-stream position alongside the moored ocean-going vessel. The GEMINI then anchored and the cargo barge was secured to the side of the GEMINI opposite the ocean going

---

[2]In *Johnson,* this court recited three factors closely related to the three listed above: (1) intention of the owner to move the structure on a regular basis, (2) ability of the submerged structure to be refloated, and (3) the length of time the structure has remained stationary. 864 F.2d at 43 (citing *Hemba v. Freeport McMoran Energy Partners, Ltd.,* 811 F.2d 276, 278 (5th Cir.1987)). *Johnson* also listed the following additional factors: (1) navigational aids, (2) a raked bow, (3) lifeboats and other life-saving equipment, (4) bilge pumps, (5) crew quarters, and (6) registration as a vessel with the Coast Guard. *Id.* (citing *Bernard,* 741 F.2d at 832).

7

vessel.  Thus, unlike the K-2, which has been permanently moored to the river bed since 1982, GEMINI was a free-floating structure that moved freely along a six-mile stretch of the Mississippi River to wherever the ocean-going vessel was moored.  See *id.* at 190.

The capacity of the K-2 to be towed on navigable waters and transport cargo does not make it a vessel.  We have routinely held that floating work platforms and dry docks, even if equipped for travel across navigable waters, are not vessels when permanently moored and used as work platforms or dry docks.  *See, e.g., Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 293 n. 8 (5th Cir.1990) (citing cases);  *Johnson,* 864 F.2d at 43 (oil platform and storage facility towed to its location in 1961 and secured into place by concrete was not a vessel);  *Hemba,* 811 F.2d at 278 (structure moved only twice in twenty years and attached to gulf bottom by pilings driven into ocean floor was not a vessel);  *Davis v. Cargill, Inc.,* 808 F.2d 361, 362 (5th Cir.1986) (former cargo barge, anchored to river bed, to which ships would moor for painting services was not a vessel);  *Blanchard,* 575 F.2d at 1147 (gas compressor building mounted on floating barge which had not been moved since it was installed in 1952 was not a vessel);  *Atkins v. Greenville Shipbuilding Corp.,* 411 F.2d 279, 283 (5th Cir.) (" "A fixed structure such as this drydock is not used for the purposes of navigation ... any more than is a wharf or warehouse when projecting into or upon the water.' " (quoting *Cope v. Vallette Dry-Dock Co.,* 119 U.S. 625, 627, 7 S.Ct. 336, 336, 30 L.Ed. 501 (1887)), *cert. denied,* 396 U.S. 846, 90 S.Ct. 105, 24

L.Ed.2d 96 (1969).

As these cases indicate, the fact that the K-2 has remained in place for ten years makes it a non-vessel despite our holding in *Michel.* For example, in *Johnson,* this court in affirming summary judgment distinguished the structure in question from a similar structure which had been deemed a vessel in an earlier case on the basis that the structure at issue had "remained in the same place for twenty-four years ..., and it remains there even today." *Johnson,* 864 F.2d at 43. Likewise, in *Daniel,* this court distinguished a floating platform that had been moored to shore since 1979 from a similar platform that moved from jobsite to jobsite, stating: "Unloading cargo onto a stationary structure is not ... a transportation function." *Daniel,* 892 F.2d at 408.

The occasional minimal movement of the K-2 along its cables to reposition its offloading spouts over the cargo holds of the vessel does not undermine this conclusion. "[S]ome movement, both perpendicular and lateral, is necessarily part of the regular operation of floating dry docks and similar structures. However, capability to sustain such movement has been held insufficient to establish that such craft are constructed for the purpose of navigation." *Cook v. Belden Concrete Prods., Inc.,* 472 F.2d 999, 1002 (5th Cir.), *cert. denied,* 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973).

This court's decision in *Leonard v. Exxon Corp.,* 581 F.2d 522 (5th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979), is particularly instructive in this regard. In

*Leonard,* the plaintiff worked on a platform made of four flat-deck barges. Three of the barges were placed end-to-end and lashed together. The three-barge structure was permanently moored to the shore by cables. A crane was positioned on the fourth barge, which was located between the shore and the other three barges. This barge served as a crane platform and as an access ramp to the other three barges and was connected to shore by a wooden ramp. To permit the crane to service the other three barges, the three barge structure would occasionally be moved slightly forward or backward until it was properly positioned. *See id.* at 524. The court concluded that the platform was not a vessel as a matter of law, reasoning that any transportation function it performed was purely incidental. *Id.*

The similarity between the K-2 and our numerous work platform cases compels our conclusion that the K-2 is not a vessel as a matter of law. In sum, we agree with the district court that denial of remand was proper because plaintiffs could not possibly establish that the K-2 was a vessel, an essential element of their Jones Act claim.

### C.

Plaintiffs argue next that Cargill was not entitled to summary judgment. Because we have already concluded that the K-2 is not a vessel as a matter of law, plaintiffs' Jones Act and general maritime law actions against Cargill must fail. "Summary judgment will always be appropriate in favor of a defendant against whom there is no possibility of recovery." *Carriere,* 893 F.2d at 102.

10

Plaintiffs, and Cargill as an intervenor, argue next that the district court's grant of summary judgment in favor of MEMCO was improper. We, of course, review a grant of summary judgment de novo. *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 618 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Summary judgment is appropriate where the record reflects that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Plaintiffs' amended complaint seeks recovery against MEMCO under § 905(b) of the LHWCA, which allows a longshoreman injured as a result of the negligence of a vessel to bring an action for damages against the vessel. 33 U.S.C. § 905(b). Plaintiffs claim that MEMCO's failure to install non-skid surfaces on its hatch covers constitutes actionable negligence under § 905(b).

In *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court articulated the scope of a vessel's duty under § 905(b). *Scindia* established that "the primary responsibility for the safety of the longshoremen rests upon the stevedore."[3] *Randolph v. Laeisz,* 896 F.2d 964, 970 (5th Cir.1990). However, vessel liability may still arise

1) if the vessel owner fails to warn on turning over the ship

---

[3]We have held that these principles also apply to LHWCA-covered employees of independent contractors other than stevedores. *Hill v. Texaco, Inc.,* 674 F.2d 447 (5th Cir.1982).

of hidden defects of which he should have known.

2) for injury caused by hazards under the control of the ship.

3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazards and that the stevedore, in the exercise of "obviously improvident" judgment means to work on in the face of it and therefore cannot be relied on to remedy it.

*Pimental v. LTD Canadian Pacific Bul,* 965 F.2d 13, 15 (5th Cir.1992).

The district court held that the summary judgment evidence negated a finding of liability under any of the above *Scindia* scenarios. Assuming, without deciding, that an injury to a longshoreman on a wharf or platform by a piece of a vessel, its gear or equipment can give rise to § 905(b) liability against the vessel owner, we agree with the district court that the summary judgment evidence demonstrates that MEMCO has no liability under *Scindia.*

MEMCO asserts that it cannot be liable under the first *Scindia* duty of failure to warn of a hidden defect because the slippery hatch cover was an open and obvious danger. A defendant generally has not breached its duty to turn over a safe vessel if the defect causing the injury is open and obvious. *Id.* at 16. The courts have created a narrow exception to this rule where a longshoreman's only options when facing an open and obvious danger are unduly impracticable or time-consuming. *Id.*

The summary judgment evidence reveals that Burchett was aware of the accumulation of soybean dust and dew on the hatch cover and knew that it would cause the cover to be slippery. In fact,

12

Burchett admitted in his deposition that he had seen a co-worker slip under the same conditions. He further admitted that none of the steel hatch covers he had encountered previously had non-skid surfaces and that he had also seen men slip and fall under similar conditions on fiberglass covers with non-skid surfaces. The summary judgment evidence also does not indicate that Burchett was obliged to climb onto the hatch cover. Burchett testified in his deposition that he climbed onto the hatch cover only because the K-2 crew was shorthanded that day. According to Burchett, a crane operator would not need to climb onto the hatch covers under ordinary circumstances.

For similar reasons, MEMCO cannot be liable under *Scindia's* second scenario, which imposes liability for injury caused by hazards under the vessel owner's control. The vessel has a duty to "exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622. The summary judgment evidence showed that the hatch cover was removed from MEMCO's "dumb barge" and stacked on the cover deck of the K-2 by Cargill personnel. No MEMCO personnel were present at any time during the offloading process. The dust accumulated on the cover as a result of Cargill's offloading operation. Cargill also controlled the number of men working on the K-2 cover deck. Thus, MEMCO neither controlled nor created the circumstances leading to Burchett's injury.

13

As to the third *Scindia* scenario, which imposes on the vessel a duty to intervene, the vessel must have "actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of danger." *Randolph,* 896 F.2d at 971.  As indicated above, MEMCO had no personnel present at the job site who could have had knowledge of any peculiar dangers related to Cargill's unloading operations. *See Helaire v. Mobil Oil Co.,* 709 F.2d 1031, 1038-39 (5th Cir.1983).

## IV.

For the reasons stated above, we affirm the judgment of the district court.

AFFIRMED.