**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**October 25, 2005**

Charles R. Fulbruge III
Clerk

REVISED NOVEMBER 16, 2005
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 04-30732

---

ADDIE HOLMES,

Plaintiff-Appellant,

versus

ATLANTIC SOUNDING COMPANY INC;
WEEKS MARINE INC; ABC INSURANCE
CO; XYZ INSURANCE CO,

Defendants-Appellees;

--------------------------------------------------------
Cons. No. 04-30750

ADDIE HOLMES,

Plaintiff-Appellant,

versus

ATLANTIC SOUNDING COMPANY INC;
ABC INSURANCE CO INC,

Defendants-Appellees.

---------------------------
Appeals from the United States District Courts
for the Western District of Louisiana
--------------------

Before WIENER, DEMOSS, and PRADO, Circuit Judges.

WIENER, Circuit Judge:

In this consolidated appeal of two state actions that were removed to different district courts, Plaintiff-Appellant Addie Holmes appeals the denial of her motion to remand and the dismissal of her Jones Act and general maritime law personal injury suit against defendants-appellees, Atlantic Sounding Co., Inc. ("Atlantic"), her nominal payroll employer, and Weeks Marine, Inc. ("Weeks"), for which she was actually performing services at the time in question. The dispositive issue — whether an unpowered floatable structure like Weeks's quarterbarge BT-213 ("the BT-213"), on which Holmes was working when injured, is a <u>vessel</u> for Jones Act purposes — is not one of first impression in this circuit. We resolved this issue in <u>Gremillion v. Gulf Coast Catering Co.</u>,[1] answering the question in the negative; however, the Supreme Court's recent decision in <u>Stewart v. Dutra Construction Co.</u>[2] calls into question the analysis underlying our holding in <u>Gremillion</u>. We therefore must determine what effect, if any, <u>Stewart</u> has on this aspect of our vessel jurisprudence. We affirm.

## I. FACTS

Holmes sued defendants-appellees Atlantic and Weeks (collectively, "appellees") in Louisiana state court seeking damages for injuries that she allegedly sustained on her first day of work as a cook aboard the BT-213. Holmes is a Louisiana

---

[1] 904 F.2d 290 (5th Cir. 1990).

[2] — U.S. —, 125 S. Ct. 1118 (2005).

domiciliary.  Both Atlantic and Weeks are New Jersey corporations with their principal place of business in Cranford, New Jersey.

The BT-213 is 140 feet long and 40 feet wide.  It is, in effect, a floating dormitory, a barge on the deck of which a two-story, 50-bed "quarters package" is mounted.  Weeks causes the BT-213 to be moved from place to place to house and feed employees during dredging projects at various locations.  The BT-213 has sleeping quarters on both stories, as well as toilet facilities, a fully-equipped galley, locker rooms, freshwater deck tanks, diesel-powered electrical generators, and a gangway with railings.  The BT-213's entire "crew" consists of two cooks and two janitors.  There is no record evidence that they are transported on the BT-213 while it is moved from one site to another.

The BT-213 is towed by tugs between project locations.  It is sometimes towed by itself and, at times, together with other barges. Weeks temporarily installs battery-operated running lights on the BT-213 when it is to be towed by itself.  When the BT-213 is not in use, it is held in a boat slip at Weeks's facility in Houma, Louisiana.  At the time of Holmes's accident, the BT-213 was moored in a private boat slip at Holly Beach in Cameron Parish while the crew of Weeks's dredge worked in the Gulf of Mexico.  The BT-213 arrived at Holly Beach in August 2002 and had not moved before Holmes's accident the following month.

The BT-213 has never been inspected by or registered with the Coast Guard.  It is not intended to transport personnel, equipment,

3

passengers, or cargo, and no evidence in the record reflects that it has ever done so or is capable of doing so. It is not fitted out with winches, running lights, a radar, a compass, engines, navigational aids, Global Positioning System, lifeboats, or steering equipment such as rudders. It is incapable of self-propulsion; has no captain, engineer, or deckhand; has no bilge pumps or wing tanks; and has never been offshore.

On the other hand, the BT-213 has a raked bow on each end, and "two end tanks where the rakes are . . . for flotation." It has a radio that is used primarily to communicate with the dredge. It is equipped with bits or bollards that are used to tie it to the shore or to other vessels or structures. It is sometimes moored by anchors and is equipped with life rings and portable water pumps.

Holmes alleges that when she attempted to place her belongings in her locker on the BT-213, both the locker and a television set that was on top of it fell on her as she opened the locker door. She alleges further that the accident caused injuries to her neck, shoulder, ears, and nose and caused dizziness as well.

Holmes sued Atlantic and Weeks in Louisiana state court, asserting claims under the Jones Act[3] and general maritime law. She later filed a second suit in Louisiana state court against only Atlantic, seeking maintenance and cure.

---

[3] 46 U.S.C. § 688.

These cases were removed to different federal district courts. In their respective removal notices, Atlantic and Weeks advanced that Holmes fraudulently pleaded a Jones Act claim to prevent removal to federal court and that diversity jurisdiction existed under 28 U.S.C. § 1332. Holmes responded with motions to remand both suits. The magistrate judge ordered the parties to brief the issue of Jones Act liability.

After discovery and briefing were complete, the magistrate judge issued reports and recommendations in both suits, proposing that the district courts deny Holmes's motions to remand and enter judgments in favor of Weeks and Atlantic. The magistrate judge concluded that (1) the BT-213 is not a vessel for purposes of the Jones Act, (2) Holmes could not establish any possibility of recovery under the Jones Act, and (3) as diversity jurisdiction existed, removal was proper. Holmes timely objected to the magistrate judge's report and recommendation.

In June 2004, the district court to which Holmes's maintenance and cure suit against Atlantic had been removed adopted the report and recommendation and issued a partial final judgment in favor of Atlantic. After Holmes conceded that no other viable claims remained, the district court amended the partial final judgment to reflect its finality.

One month later, the district court to which Holmes's Jones Act and general maritime law suit against Weeks and Atlantic had been removed adopted the magistrate judge's report and

5

recommendation, denied Holmes's motion to remand, and dismissed her Jones Act claim.  The court certified the partial final judgment under Federal Rule of Civil Procedure 54(b).  Holmes timely filed notices of appeal in both courts.  We consolidated the appeals of these two cases.

## II. ANALYSIS

### A.    Standard of Review

We review the denial of a motion to remand de novo.[4]  We also review a district court's grant of summary judgment de novo.[5] Whether an unconventional craft is a vessel is an issue that is generally resolved as a matter of law, although we have recognized that "at the margin, fact issues may be presented."[6]

### B.    Issues

#### 1.    Removal

Generally, Jones Act cases are not removable from state court.[7]  A fraudulently pleaded Jones Act claim does not, however,

---

[4] S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996) (citing Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1336 (5th Cir. 1995).

[5] S.W.S. Erectors, Inc., 72 F.3d at 492 (citing Lee v. Wal-Mart Stores, Inc., 34 F.3d 285, 288 (5th Cir. 1994)).

[6] Manuel v. P.A.W. Drilling & Well Serv., 135 F.3d 344, 347 (5th Cir. 1998) (citing Ducote v. Keeler & Co., Inc., 953 F.2d 1000, 1002 (5th Cir. 1992)).

[7] See Burchett v. Cargill, Inc., 48 F.3d 173, 175 (5th Cir. 1995).

bar removal.[8]  A defendant may "'pierce the pleadings to show that the Jones Act claim has been fraudulently pleaded to prevent removal.'"[9]  The district court may use a "summary judgment-like procedure" to determine whether a plaintiff has fraudulently pleaded a Jones Act claim.[10]  "The court may deny remand where, but only where, resolving all disputed facts and ambiguities in current substantive law in plaintiff's favor, the court determines that the plaintiff has no possibility of establishing a Jones Act claim on the merits."[11]

To qualify as a seaman under the Jones Act, an employee must first demonstrate that his duties "'contribute to the function of the vessel or to the accomplishment of its mission.'"[12]  Second, "a seaman must have a connection to a vessel in navigation (or an identifiable group of vessels) that is substantial in terms of both its duration and its nature."[13]  Atlantic and Weeks contend only that the BT-213 is not a vessel under the Jones Act.  Accordingly, if Atlantic and Weeks carry their burden and demonstrate that there

---

[8] See id.

[9] Id. (quoting Lackey v. Atlantic Richfield Co., 990 F.2d 202, 207 (5th Cir. 1993)).

[10] Id. at 176.

[11] Hufnagel v. Omega Serv. Indus., Inc., 182 F.3d 340, 345-46 (5th Cir. 1999) (citing Burchett, 48 F.3d at 176).

[12] Chandris, Inc. v. Latsis, 515 U.S. 347, 359 (1995) (quoting McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355 (1991)).

[13] Id.

7

exists no genuine issue of material fact as to the BT-213's vessel status, removal was proper, as was dismissal. For the following reasons, we find that the BT-213 is not a vessel for Jones Act purposes. Accordingly, we uphold the district court's denial of Holmes's motions to remand.

## 2. Our Pre-<u>Stewart</u> "Vessel" Jurisprudence

"The existence of a vessel is a 'fundamental prerequisite to Jones Act jurisdiction' and is at the core of the test for seaman status."[14] The term "vessel" has, however, escaped precise definition. The exotic watercraft that have been deemed vessels and the heavy inquiry that surrounds each analysis of an unconventional craft's status has led even this court to recognize that the "three men in a tub would . . . fit within our definition [of a Jones Act seaman], and one probably could make a convincing case for Jonah inside the whale."[15]

Historically, we have noted that the term "vessel" connotes a structure designed or used for "transportation of passengers, cargo or equipment from place to place across navigable waters."[16] "As a general principle, where the vessel status of an unconventional

---

[14] <u>Daniel v. Ergon, Inc.</u>, 892 F.2d 403, 407 (5th Cir. 1990) (quoting <u>Bernard v. Binnings Constr. Co.</u>, 741 F.2d 824, 828 (5th Cir. 1984)).

[15] <u>Burks v. Am. River Transp. Co.</u>, 679 F.2d 69, 75 (5th Cir. 1982).

[16] <u>Cook v. Belden Concrete Prods.</u>, 472 F.2d 999, 1002 (5th Cir. 1973).

8

craft is unsettled, it is necessary to focus upon 'the purpose for which the craft is constructed and the business in which it is engaged.'"[17] "The greater the structure's resemblance to conventional seafaring craft, the greater the odds of securing vessel status."[18]

To evaluate the purpose for which a craft is constructed, we have considered: (1) whether the owner assembled or constructed the craft to transport passengers, cargo, or equipment across navigable waters; (2) whether the craft is engaged in that service; (3) whether the owner intended to move the craft on a regular basis; (4) the length of time that the craft has remained stationary; and (5) the existence of other "objective vessel features," such as: (a) navigational aids; (b) lifeboats and other life-saving equipment; (c) a raked bow; (d) bilge pumps; (e) crew quarters; and (f) registration with the coast Guard as a vessel.[19]

To determine the business in which the craft is engaged, "evaluating the craft's <u>transportation</u> function is the key to determining the craft's status."[20] When the transportation function of the craft is merely incidental to the craft's primary purpose,

---

[17] <u>Gremillion v. Gulf Coast Catering Co.</u>, 904 F.2d 290, 292 (5th Cir. 1990) (quoting <u>Blanchard v. Engine & Gas Compressor Servs., Inc.</u>, 575 F.2d 1140, 1142 (5th Cir. 1978)).

[18] <u>Id.</u>

[19] <u>Manuel</u>, 135 F.3d at 350-51; <u>Gremillion</u>, 904 F.2d at 2936.

[20] <u>Manuel</u>, 135 F.3d at 351 (emphasis added).

9

we have consistently held that the craft is not a vessel.[21] On the other hand, when the transportation function of the craft is "an important part of the business in which the craft was engaged," we have generally found the craft to be a vessel, even if it has also served as a work platform.[22] We have attributed three common attributes to nonvessels:

> (1) The structure was constructed to be used primarily as a work platform;
> (2) the structure is moored or otherwise secured at the time of the accident; and
> (3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose.[23]

### 3.   Stewart

With this backdrop in mind, we turn to the recent Supreme Court opinion in Stewart v. Dutra Construction Co.[24] to determine any possible effect on our vessel jurisprudence. In Stewart, the plaintiff sued Dutra Construction Co. ("Dutra") under the Jones Act and the Longshore Harbors Workers' Compensation Act ("LHWCA") after he injured himself on Dutra's dredge, the Super Scoop.[25] The Court described the Super Scoop as follows:

---

[21] See id.

[22] See id.

[23] Pavone v. Miss. Riverboat Amusement Corp., 52 F.3d 560, 570 (5th Cir. 1995); Gremillion, 904 F,2d at 294.

[24] — U.S. —, 125 S. Ct. 1118 (Feb. 22, 2005).

[25] See id. at 1121-22.

10

The Super Scoop is a massive floating platform from which a clamshell bucket is suspended beneath the water. The bucket removes silt from the ocean floor and dumps the sediment onto one of the two scows that float alongside the dredge. The Super Scoop has certain characteristics common to seagoing vessels, such as a captain and a crew, navigational lights, ballast tanks, and a crew dining area. But it lacks others. Most conspicuously, the Super Scoop has only limited means of self-propulsion. It is moved long distances by tugboat. . . . It navigates short distances by manipulating its anchors and cables.[26]

The district court granted summary judgment in favor of Dutra "because the Super Scoop's primary purpose was dredging rather than transportation and because it was stationary at the time of Stewart's injury."[27] The district court held, as a matter of law, that (1) the Super Scoop was not a vessel, and (2) Stewart could not establish seaman status. The court of appeals affirmed.[28] The Supreme Court granted certiorari and reversed.

The Supreme Court granted certiorari "to resolve confusion over how to determine whether a watercraft is a 'vessel' for purposes of the LHWCA."[29] The Court stated that 1 U.S.C. § 3 provides the controlling definition of "vessel" for LHWCA purposes:[30] "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of

---

[26] Id. at 1121.

[27] Id. at 1122.

[28] Id.

[29] Id. at 1123.

[30] See id. at 1129.

11

transportation on water."[31]  Although the issue on which the Court

granted certiorari would appear at first to limit Stewart's

precedential force to LHWCA cases only, we cannot read Stewart so

narrowly.  Indeed, the Court's opinion refers to the Jones Act and

the LHWCA interchangeably and nowhere limits § 3's definition of

"vessel" to the LHWCA, either expressly or implicitly.

Other language in the opinion supports our conclusion that the

Court used Stewart to define "vessel" for purposes of both

statutes.  After noting that the Jones Act does not define "seaman"

and that the LHWCA does not define "vessel," the Court stated:

> The Shipping Act of 1916 defines the term "vessel" for
> purposes of the Jones Act.  See 46 U.S.C. App. § 801.
> However, the provisions of the Jones Act at issue here,
> § 688(a), speaks not of "vessels," but of "seamen."  In
> any event, because we have identified a Jones Act
> "seaman" with reference to the LHWCA's exclusion, see 33
> U.S.C. § 902(3)G) ("a master or member of a crew of any
> vessel"), it is the LHWCA's use of the term "vessel" that
> matters.  And, as we explain, the context surrounding
> Congress' enactment of the LHWCA suggests that Rev. Stat.
> § 3, now 1 U.S.C. § 3, provides the controlling
> definition of the term "vessel" in the LHWCA.[32]

Further, the Court observed that its earlier cases "show[ed] that

at the time Congress enacted the Jones Act and the LHWCA in the

1920's, it was settled that § 3 defined the term 'vessel' for

purposes of those statutes."[33]  The most telling indication that the

---

[31] 1 U.S.C. § 3 (emphasis added).

[32] Id. at 1124 n. 1.

[33] Id. at 1125.

12

Court considers <u>Stewart</u>'s holding applicable to the Jones Act is found in the following language:

> Applying § 3 brings within the purview of the Jones Act the sorts of watercraft considered vessels at the time Congress passed the Act. By including special-purpose vessels like dredges, § 3 sweeps broadly, but the other prerequisites to qualifying for seaman status under the Jones Act provide some limit, notwithstanding § 3's breadth. A maritime worker seeking Jones Act seaman status must also prove that his duties contributed to the vessel's function or mission, and that his connection to the vessel was substantial both in nature and duration. Thus, even though the <u>Super Scoop</u> is a "vessel," workers injured aboard the <u>Super Scoop</u> are eligible for seaman status only if they are "master[s] or member[s]" of its crew.[34]

It is clear, then, that <u>Stewart</u> defines "vessel" for purposes of both the Jones Act and the LHWCA. Given <u>Stewart</u>'s significant broadening of the set of unconventional watercraft that must be deemed <u>vessels</u>, however, we are convinced that the Court employed the foregoing language to confirm that there still exist limits on a potential plaintiff's <u>seaman</u> status under the Jones Act.

As <u>Stewart</u>'s definition of "vessel" applies equally to the Jones Act and the LHWCA, § 3 clearly controls the definition of "vessel" for purposes of both acts. Thus, as long as a water-borne structure is practically capable of being used for transportation on navigable waters, it is a "vessel."[35] Convinced that our case

---

[34] <u>Id.</u> at 1127.

[35] <u>See</u> <u>Stewart</u>, 125 S. Ct. at 1129.

13

law was consistent with § 3's definition of a vessel,[36] we confected a list of factors and requirements from § 3's definition to aid us in determining whether an unconventional watercraft merits vessel status.[37] We must therefore determine today the effect, if any, that <u>Stewart</u> has on the continued efficacy of these factors and requirements.

We hold that <u>Stewart</u> does not fundamentally alter our "vessel" jurisprudence. One of the driving forces behind the Court's grant of certiorari in <u>Stewart</u> was to reject both the district court's and the court of appeals' reliance on two particular factors: (1) whether the <u>primary</u> purpose of the watercraft was navigation or commerce; and (2) whether the watercraft was <u>in transit</u> at the time of Stewart's injury.[38] The Court explicitly held that "[n]either prong of the Court of Appeals' test is consistent with the text of § 3 or the established meaning of the term 'vessel' in general maritime law."[39]

---

[36] <u>See</u> <u>Manuel</u>, 135 F.3d at 347 ("A 'vessel' traditionally refers to structures designed or utilized for transportation of passengers, cargo or equipment from place to place across navigable waters. This is consistent with the statutory definition which defines the word 'vessel' as including 'every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.'" (citing 1 U.S.C. § 3) (other citations and quotations omitted)).

[37] <u>See</u> text accompanying notes 17-24.

[38] <u>See</u> <u>id.</u> at 1127–29.

[39] <u>Id.</u> at 1127–28.

14

In rejecting the first prong, the Court quoted § 3's definition of vessel: "Section 3 requires only that a watercraft be 'used, or capable of being used, as a means of transportation on water' to qualify as a vessel. It does not require that a watercraft be used <u>primarily</u> for that purpose."[40] In rejecting the second prong — that the craft be in navigation at the time of injury — the Court noted that in <u>Chandris</u> it had rejected such a "snapshot" test: "Just as a worker does not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured, neither does a watercraft pass in and out of Jones Act coverage depending on whether it was moving at the time of the accident."[41]

We conclude that <u>Stewart</u>'s modification of our "vessel" jurisprudence is narrow. Specifically, we may no longer rely on whether (1) the transportation function of the watercraft is primary or incidental to the its purpose and (2) the watercraft was in motion at the time of the injury.[42] Indeed, <u>Stewart</u>'s holding

---

[40] <u>Id.</u> at 1128 (emphasis in original).

[41] <u>Id.</u> (citations and quotations omitted).

[42] With regard to the second prong, the Court noted that a vessel may still lose its status as such if it has been "withdrawn from the water for extended periods of time." <u>Id.</u> Thus, this circuit's jurisprudence holding that certain craft are not vessels because they have been withdrawn from navigation for a considerable amount of time is still good law. <u>See</u> <u>id.</u>; <u>Pavone</u>, 52 F.3d at 570 (holding that indefinitely-moored casino not a vessel for Jones Act purposes).

15

appears to affect our definition of nonvessels more than that of vessels.[43]

The Court's language in Stewart demands this conclusion. In rejecting the court of appeals' reliance on the second prong, the Court noted:

> Granted, the Court has sometimes spoken of the requirement that a vessel be "in navigation," but never to indicate that a structure's locomotion at any given moment mattered. <u>Rather, the point was that structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time.</u>
> . . .
> <u>Instead, the "in navigation" requirements is an **element** of the vessel status of the watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation.</u>[44]

The emphasized language supports our conclusion that Stewart's holding stands for the proposition that § 3 is merely the <u>starting point</u> for a determination whether an unconventional watercraft is a vessel for Jones Act and LHWCA purposes. Indeed, the Stewart Court recognized that it has always "construe[d] § 3's definition [of vessel] in light of the term's established meaning in general maritime law," explicitly confirming that "§ 3 should be construed consistently with the general maritime law."[45] The Stewart Court's use of the term "element" in describing the "in navigation" requirement strongly suggests that, even though § 3's definition of

---

[43] See supra note 24 & accompanying text.

[44] Stewart, 125 S. Ct. at 1128 (citations omitted) (emphasis added).

[45] Id. at 1126.

16

vessel is paramount, the general maritime law will continue to dictate the discrete factors and requirements that emanate from § 3's starting point. Nothing in Stewart rejects the majority of the other factors and requirements; it rejects only those two on which we and the First Circuit heretofore relied, as previously confected from § 3 in our analyses underlying our determination of vessel status in Jones Act or LHWCA cases. Accordingly, we hold that our "vessel" jurisprudence rests relatively intact, modified only by the Stewart Court's rejection of the two prongs relied on by the First Circuit in that case.

The dissent reads Stewart as stripping the vessel/non-vessel analysis of all these requirements and factors that we previously confected from § 3's definition of "vessel."[46] Thus stripped, the

---

[46] The dissent points to the Second Circuit's recent decision in Uzdavines v. Weeks Marine, Inc., 418 F.3d 138 (2d Cir. 2005), which "undertook the analysis that is required of us to correct prior precedent no longer vital after Stewart." Slip op. at ___ (DeMoss, J., dissenting). True, the Uzdavines court did modify the Second Circuit's vessel/non-vessel jurisprudence in light of Stewart (as do we here), but it did so in a manner that fails to provide support for the dissent. The Second Circuit's discussion of Stewart's impact on its vessel/non-vessel jurisprudence is pure dicta, as the Uzdavines petitioner had conceded that in light of Stewart the bucket dredge at issue qualified as a vessel. See Uzdavines, 418 F.3d at 144. It was therefore unnecessary for that court to address the effect of Stewart on its vessel/non-vessel jurisprudence.

Furthermore, even if the Second Circuit's modification of its pre-Stewart vessel/non-vessel jurisprudence was not dicta, Uzdavines' support for the dissent's position would at best be tenuous. The Uzdavines court purported to hold that Stewart "supersedes the three-part test" used by the Second Circuit to define a non-vessel. Id. That three-part test was almost identical to the three common attributes that this circuit attributed to non-vessels. See Tonnesen v. Yonkers Contracting

17

dissent's vessel/non-vessel analysis reduces to just two parts: (1) a rule (if a craft is used or is practically capable of being used as a means of maritime transportation, then that craft is a vessel); and (2) an exception to that rule (if a craft is permanently moored or otherwise rendered incapable of transportation or movement, then that craft is not a vessel).[47] The dissent's rule properly focuses the vessel/non-vessel analysis on a craft's practical capability of engaging in maritime transportation.[48] The dissent's exception to the rule strays off course, however, by overemphasizing the significance of a craft's being permanently moored or otherwise rendered incapable of movement.

---

Co., 82 F.3d 30, 36 (2d Cir. 1996) (adopting, with slight modification, this circuit's description of the three common attributes of non-vessels); see also supra text accompanying note 23 (describing the three common attributes of a non-vessel). And, as we readily acknowledge today, Stewart's greatest impact is on our non-vessel definition. See supra text accompanying note 43. Our opinion is thus in accord with Uzdavines.

[47] See slip op. at ___ (DeMoss, J., dissenting).

[48] Our disagreement on this point just goes to how that rule should be applied, i.e., whether the determination of a craft's practical capability of engaging in maritime transportation should be determined with reference to our pre-Stewart factors and requirements. We hold that it should; the dissent disagrees. The dissent contends that the only relevant question with regards to this rule is whether the craft at issue is, in fact, practically capable of engaging in maritime transportation. But that question alone cannot control the outcome of this case, as Holmes, whose burden it was, failed to adduce sufficient evidence to show the BT-213's practical capability of engaging in maritime transportation.

To be sure, the frequency and duration of the mooring and moving of a putative vessel is one of the several pre-Stewart elements for testing vessel status that remains valid in the post-Stewart world.[49] But, contrary to the dissent's reasoning, the Stewart Court's discussion of the effect of a craft's permanently static condition on its vessel/non-vessel status does not signal that a craft must be permanently moored or otherwise rendered incapable of movement to qualify as a non-vessel. Rather, the Court's discussion is a didactic reminder to all inferior federal courts that, even after Stewart broadened the test for vessel status, limits as to what constitutes a vessel still exist. In other words, crafts that are permanently affixed to the shore and are theoretically — but not practically — capable of transportation, are not "vessels" within the meaning of the Jones Act and the LHWCA. The obverse, though, does not follow: The Court neither says nor implies a per se rule that either the absence of permanent mooring or the frequency of movement (or the absence of both) automatically bars non-vessel status.

## 4. The Quarterbarge BT-213

When the undisputed facts of this case are plugged into our "vessel" jurisprudence, we find inescapable the conclusion that the BT-213 is not a "vessel," even in light of the modifications announced in Stewart. The principal dispute here turns on whether

---

[49] See supra text accompanying notes 42-45.

19

this appeal is controlled by Manuel —— as Holmes contends —— or by Gremillion —— as appellees contend.

At first blush, it would appear that Gremillion is dispositive. In Gremillion, we held that the quarterbarge MINDY was not a vessel for purposes of the Jones Act and general maritime law. We reached this conclusion because:

A.  the significance of Q/B MINDY's transportation function was purely incidental to its primary mission of providing living facilities;
B.  it did not transport cargo;
C.  it was not designed for navigation;
D.  it was not engaged in navigation at the time of the injury;
E.  there was no evidence that suggested that the barge provided housing on the open sea;
F.  the barge's motive power was provided externally through towboats as it had no engine, rudders, or navigational equipment; and
G.  it was not registered with the Coast Guard as a vessel.[50]

We conceded, however, that other factors weighed in favor of vessel status: (1) The barge had a raked bow, was equipped with navigation lights, and had life-saving equipment and crew quarters; (2) the owner intended to move it on a recurring basis; (3) the barge possessed the ability to be refloated after years of deterioration; and (4) the barge remained static only for a relatively short time.[51] In our analysis, we recognized that even though the MINDY possessed several attributes of a vessel, our objective factors

---

[50] 904 F.2d at 294 (emphasis added).

[51] See id. at 294 n. 9.

20

"are not to be applied mathematically but [only] as useful guides in determining vessel status."[52]

Apart from the above emphasized factors on which the Gremillion panel relied and that the Stewart Court rejected, the other factors are present here and weigh against vessel status. The BT-213 does not transport cargo, equipment, or personnel. Indeed, although she relies heavily on the fact that the BT-213 was moved 14 times between January 4, 2001, and September 12, 2002, Holmes points to no record evidence that transportation occurred in any of these 14 moves. Holmes mistakenly conflates "transportation" with "movement." If the sole test for vessel status were "capable of being moved," then anything that floats — even an inner tube or a canoe, perhaps (which, in the broadest sense, are also capable of § 3 transportation) — would constitute a vessel for Jones Act or LHWCA purposes.

Neither was the BT-213 designed for navigational or transportation purposes. There is no record evidence that the BT-213 ever provided housing on the open sea. Further, the BT-213, like the MINDY, relies exclusively on tugs to move it. Unlike the Super Scoop in Stewart, which could navigate short distances by manipulating its anchors and cables, the record is devoid of evidence that the BT-213 is capable of any self-propulsion whatsoever. The BT-213 has never been registered with or inspected

---

[52] Id.

by the Coast Guard. The purpose for which the BT-213 was constructed and the business in which it has engaged exclusively is <u>housing</u>. As noted earlier, the record contains no evidence that the BT-213 ever transported — or was even capable of transporting — anything; not passengers, not cargo, not equipment.[53] Indeed, unlike the dredge in <u>Stewart</u>, the BT-213 does not "serve[] a waterborne transportation function," as it does not perform its work by carrying machinery, equipment, <u>and</u> crew "over water."[54]

Holmes insists that it is <u>Manuel</u>, not <u>Gremillion</u>, that controls this case. Holmes argues that our vessel jurisprudence was previously modified by <u>Southwest Marine, Inc. v. Gizoni</u>[55] and

---

[53] In <u>Gremillion</u>, we observed a common theme that exists in our jurisprudence granting vessel status to "special purpose vessels," such as the BT-213: "Despite the outward appearance of the structure at issue, if a primary purpose of the craft is to transport passengers, cargo, or equipment from place to place across navigable waters, then that structure is a vessel." 135 F.3d at 348. Although the use of the term "primary" has been modified by <u>Stewart</u>, any possible transportation function of the watercraft is still a factor to be taken into consideration when determining vessel status. <u>See also</u> <u>Brunet v. Boh Bros. Constr. Co., Inc.</u>, 715 F.2d 196 (5th Cir. 1983) (holding that barge consisting of several interlocking flexi-float platforms and designed to transport crane across navigable waters was vessel); <u>Producers Drilling Co. v. Gray</u>, 361 F.2d 432 (5th Cir. 1966) (holding submersible drilling barge designed to transport drilling equipment to drill site qualified as vessel as a matter of law); <u>Offshore Co. v. Robison</u>, 266 F.2d 769 (5th Cir. 1959) (holding that genuine issue of material fact existed as to whether drilling barge on which a drilling rig was mounted and transported qualified as vessel).

[54] 125 S. Ct. at 1126; <u>see</u> <u>supra</u> note 20 and accompanying text.

[55] 502 U.S. 81 (1991).

that we recognize this modification in <u>Manuel</u>. Holmes's reliance on <u>Gizoni</u> and <u>Manuel</u> is misplaced.

In <u>Manuel</u>, we held that the Rig 3, a workover rig, was a vessel for purposes of the Jones Act and general maritime law.[56] Using our two-prong test set out above, we determined that (1) the business in which Rig 3 engaged — transporting across navigable waters all of the equipment necessary to plug and abandon oil wells — weighed in favor of vessel status; and (2) the purpose for which the floatable structure of the rig was built — to transport the workover rig and its attendant equipment from place to place — also weighed in favor of vessel status.[57] That is not the case here. The BT-213 has never transported — nor was it designed or built to transport — anything between project locations.[58]

_____

[56] 135 F.3d at 351.

[57] <u>See</u> <u>id.</u>

[58] Indeed, the BT-213 more closely resembles other floating structures that this circuit has held are not vessels. <u>See, e.g.</u>, <u>Gremillion</u>, 904 F.2d at 294 (holding that shoreside quarterboat barge serving as floating hotel did not merit vessel status); <u>Daniel v. Ergon, Inc.</u>, 892 F.2d 403 (5th Cir. 1990) (holding that floating barge moored to shore, remaining in place for seven years, and used as work platform to clean and strip cargo and gas from barges, and that possessed no propulsion, crew quarters, or navigation lights did not qualify as vessel); <u>Ducrepont v. Baton Rouge Marine Enters., Inc.</u>, 877 F.2d 393 (5th Cir. 1989) (holding that barge moored to shore and used as stationary work platform not a vessel); <u>Bernard v. Binnings Constr. Co., Inc.</u>, 741 F.2d 824 (5th Cir. 1984) (holding that work punt — a floating iron platform — not a vessel because it was not designed for navigation nor did it have any significant transportation function).
<u>One caveat</u>: Most of these cases relied — at least in part — on the incidental (as opposed to primary) transportation function of the floating platform, a factor rejected by <u>Stewart</u>.

23

At oral argument, Holmes advanced that the BT-213 does transport equipment from place to place; specifically, that the room-and-board modules —— presumably attached to the hull —— is moved from dredge job to dredge job, implying that this superstructure is "equipment." We reject this specious argument. First, neither party briefed exactly what constitutes "equipment" for purposes of the Jones Act's transportation requirement. In fact, if we were to hold that such housing —— if not permanently then at least indefinitely attached to a bare hull or work platform —— constitutes "equipment" for purposes of vessel transportation, we would be greatly expanding the concept of equipment in this context. Indeed, we would be hard-pressed to conclude that any other appurtenance attached to the watercraft would not fall within that rubric. Our traditional understanding of "equipment," as that term is used in our Jones Act and LHWCA cases, is an item or items loaded onto a vessel at one location and moved —— "transported" —— to another location to perform a specific function, such as machines and equipment loaded onto a vessel onshore and delivered, for example, to an offshore drilling station or production platform. As we understand the case law, "equipment" does not include the appurtenances that contribute exclusively to the mission or function of the putative vessel itself. Here, the living module is no more transported equipment than are the BT-213's gangway, life rings, and water pumps.

24

Although Holmes is correct that Gizoni modified our case law, making suspect any holding, such as Gremillion's, that was handed down before Gizoni, her reliance on this modification is inapposite to the case before us. In Gizoni, the Court treated the issue whether "a maritime worker whose occupation is one of those enumerated in the [LHWCA] may yet be a 'seaman' within the meaning of the Jones Act and thus be entitled to bring suit under that statute."[59] Affirming the Ninth Circuit, the Supreme Court held that genuine issues of material fact existed as to whether (1) the plaintiff was entitled to recover under both statutes, (2) the floating platform on which Gizoni worked was a vessel in navigation, and (3) the employee was a member of the crew.[60]

The Manuel panel recognized Gizoni's effect on our jurisprudence:

> We must also note that many of our work platform cases were decided before the Supreme Court's decision in Southwest Marine, Inc. v. Gizoni, where the Court concluded that genuine issues of material fact existed "regarding whether the floating platforms [upon which plaintiff worked] were vessels in navigation" and whether the plaintiff had a sufficient connection to these platforms to qualify as a seaman. The floating platforms consisted of a pontoon barge, tow float barges, a rail barge, a diver's barge, and a crane barge. None of the barges had means of steering, navigation lights or aids, living facilities, or motor power. The barges were moved around the shipyard by tugboat and were used to transport equipment, materials, supplies, and vessel components

---

[59] 502 U.S. at 83.

[60] See id. at 92.

25

around the shipyard and on to and off of the vessels
under repair.[61]

Thus, not only were the barges in _Gizoni_ used to transport equipment, material, and supplies to other vessels, but the Court upheld only the Ninth Circuit's determination that a genuine issue of material fact existed as to the barges' status, and that the parties disputed those facts. There are no disputed facts here, so dismissal was proper. Neither, as noted above, was the BT-213 ever used to transport anything within the intendment of § 3 or the Jones Act. _Gizoni_ and _Manuel_ are thus distinguishable. All this leads us to conclude that the majority of factors that remain relevant post-_Stewart_ weigh heavily in favor of the BT-213's nonvessel status.

### III. CONCLUSION

For the foregoing reasons, we affirm the district courts' denials of Holmes's motions to remand and their dismissals of her Jones Act and general maritime claims.

AFFIRMED.

---

[61] 135 F.3d at 350 n. 8 (citations omitted) (alteration in original) (emphasis added).

DeMOSS, Circuit Judge, dissenting:

With respect for the majority's careful analysis on a close question of law, I dissent. The Supreme Court's decision in *Stewart* requires our Circuit to reevaluate precedent that defines "vessel" and the tests by which we mark the contours of the term. On the rare occasion of a unanimous, on-point opinion from the Supreme Court, we must be careful to apply its demands on our Circuit's canon, even if those demands require the broadening of our jurisprudence. The Supreme Court need not explicitly overrule our case law in order to require that we tailor it. *Stewart* so requires.

*Stewart* requires that we enlarge *Gremillion*, and our Circuit's factors and requirements "confected" from § 3's vessel definition. *See Stewart*, 125 S. Ct. at 1129. It necessarily follows from the broad language and broad "practically capable of being used for transportation" analysis of *Stewart* that more types of water crafts are now and will be vessels, as a matter of law, than would have been so defined in this Circuit previously. *See id*. The majority implies that this is so, *see Manuel*, 135 F.3d at 347, but we do not satisfy *Stewart*'s broad vessel landscape merely by concluding that our pre-*Stewart* vessel jurisprudence is consistent with § 3, as a starting point for the vessel determination. It must not only be consistent with § 3 but also eliminate the additional factors and

requirements eschewed by *Stewart*, not just the "purpose" and "transit at the moment of injury" factors explicitly rejected there.

The majority ably explains why *Stewart* must apply to the Jones Act as well as to the LHWCA. *See Stewart*, 125 S. Ct. at 1124; *see also Stewart v. Dutra Constr. Co. Inc.*, No. 02-1713, 2005 U.S. App. LEXIS 16612 (1st Cir. Aug. 9, 2005) (applying the reasoning of *Stewart* to define vessel under the Jones Act in the same manner as under the LHWCA); *Uzdavines v. Weeks Marine, Inc.*, No. 03-40084, 2005 U.S. App. LEXIS 15946, at *14 (2d Cir. Aug. 3, 2005) (making the extension, that *Stewart* requires, of § 3's definition for vessel to the Jones Act).

I also agree with the majority that *Stewart* primarily corrected two errors of the lower courts in that case: (1) their reliance on the primary purpose of the craft and (2) their reliance on whether the craft was in transit at the time of injury. The conclusion is inescapable that our pre-*Stewart* jurisprudence countenancing these two rejected factors is necessarily erroneous as well. *See*, *e.g.*, *Manuel*, 135 F.3d at 350-51 (providing factors for determining the purpose of the craft's construction); *Gremillion*, 904 F.2d at 293 (citing *Blanchard*, 575 F.2d at 1142) (concluding that the purpose of the craft's construction is

necessary to determination of vessel status).[62]  In *Uzdavines*, the Second Circuit undertook the analysis that is required of us here to correct prior precedent no longer vital after *Stewart*, and in which I believe the majority has too broadly determined how much of our vessel precedents survives.  2005 U.S. App. LEXIS 15946, at * 15 (concluding the Second Circuit's former test that included an element of "primary purpose" does not survive *Stewart*).

*Stewart* does more than reject the "primary purpose" and "moment of injury snapshot" tests.  *See Stewart*, 125 S. Ct. at 1129.  While § 3 remains the fundamental definition for determining a craft's status as a vessel, the additional factor to be considered beyond § 3's plain text is the one now emphasized by *Stewart* — any craft's *practical* use or capability of being used as a means of maritime transportation — and not all of the factors previously considered in our Circuit that create a more narrow set of vessels than is now contemplated by the Supreme Court.

**The quarters barge is practically, not just theoretically, "used, or capable of being used, as a means of transportation on water."**

Undisputed facts confirm the BT-213 quarters barge is practically capable of transporting equipment, including supplies for crew members of the barge and for the crew of the dredges, from place to place to accommodate the different location of dredging

---

[62]I note that *Gremillion*'s language of bias for the "traditional craft" cannot co-exist with *Stewart*'s broad "capable of being used for transportation" definition. *Compare Gremillion*, 904 F.2d at 293, *with Stewart*, 125 S. Ct. at 1128-29.

activities.  Fourteen such movements appear in the record, creating a pattern of actual use that far exceeds the much lower threshold of capability of use that *Stewart* would permit for vessel status. *See id*.

The BT-213 is also undeniably capable of transporting personnel and cargo.  That she was constructed for the purpose of floating and providing movable housing is no longer of moment in our vessel analysis; and the analysis of *Stewart* does not require that the quarters barge perform a transportation function, but rather that it be practically capable of such use.  While the majority relies upon our two-prong test, including specifically that the BT-213 was not designed nor built to transport, *Stewart* requires us to apply a different set of questions.  The majority's reliance on a lack of equipment transportation, while compelling in its rejection of Holmes's argument that the housing superstructure is not traditional equipment under maritime law, fails to account for the much broader conception of vessel transportation countenanced in *Stewart*.  Moreover, the majority's analysis on the point of equipment transportation implies that practical transportation requires "delivery," when no such requirement exists.  Instead, *Stewart*'s reliance on *The Alabama*, 19 F. 544, 546 (S.D. Ala. 1884), recognizes that capacity for navigation is the key to understanding capacity for transportation.  *Stewart*, 125 S. Ct. at 1125.

Here, the combination of the quarters barge's repeated movement — albeit not by self-propulsion — and the quarters barge's equipment with the housing supplies, the "quarters package," as well as navigational instruments, a railed gangway, and land lines, used only for temporary mooring, all weigh in favor of determining that the craft is practically capable of being used as maritime transportation. The BT-213 is capable of "travers[ing] waters, carrying with it workers like [Holmes]." *Id*. at 1128.

**The quarters barge is not "permanently moored" or rendered "practically incapable of transportation or movement."**

The broad language of *Stewart*'s vessel definition is not entirely unchecked. A limit to the "capable of being used as a vessel" standard exists if the craft is, again in terms of practicality, rendered "incapable of transportation *or movement*." *Id*. at 1127 (emphasis added). The BT-213 does not cross this drawn line. "A ship [does] not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again." 125 S. Ct. 1127.

The BT-213 is not sufficiently similar to other permanently fixed, grounded, or converted crafts that fall within *Stewart*'s exception and have traditionally, because of that permanent disability, in this Circuit avoided classification as a vessel.

31

*See Gremillion*, 904 F.2d at 291 (finding the quarters barge there was not a vessel where the barge had been "partially sunk into a shoreside mudbank" and was "used *exclusively* as a *stationary* housing facility in shallow coastal and inland waters") (emphasis added); See also *Pavone*, 52 F.3d at 570 (concluding "indefinitely moored, shore-side, floating casinos" must be added to grouping of crafts that are not vessels because of practical incapability of movement or navigation).

Instead, the BT-213 more closely parallels the unique category of craft, such as a jack-up drilling rig, that has dual elements of navigation capacity and work platform function. *See Manuel*, 135 F.3d at 351 (citing, as examples, *Colomb v. Texaco, Inc.*, 736 F.2d 218, 220-21 (5th Cir. 1984), and *Brunet v. Boh Bros. Constr. Co.*, 715 F.2d 196, 198 (5th Cir. 1983)). The BT-213 falls between the clear categories of traditional self-propelled vessel and of permanently moored craft or craft rendered practically incapable of transportation; and as such, it remains within *Stewart*'s broad scope of vessel status.

I cannot say I would have drafted as broad a framework for analysis as has the Supreme Court, but in light of *Stewart*, I cannot agree that our prior vessel jurisprudence is as unaffected as the majority resolves. I would vacate the district courts' denials of Holmes's motions to remand and remand to the state court

for further proceedings consistent with the legal determination that the BT-213 is a vessel under the Jones Act.